# Exhibit 2

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| A.G., | * | |
| | * | |
| Plaintiff, | * | |
| vs. | * | Civil Action No. |
| | * | 1:20-cv-05231-JPB |
| NORTHBROOK INDUSTRIES, INC. | * | |
| D/B/A UNITED INN AND SUITES | * | |
| | * | |
| | * | |
| Defendant. | * | |
| | * | |

# Expert Report of Dr. Kimberly Mehlman-Orozco
# CEO of Break the Chain LLC
# 15920 Fairway Drive
# Dumfries, Virginia 22025
# (703) 362-9405

**SUBMITTED BY DR. KIMBERLY MEHLMAN-OROZCO on July 14, 2023[1].**



---

[1] I may prepare graphic or illustrative exhibits based on the information reviewed and/or my analyses for use at trial. I reserve the right to amend my analysis, opinions, and this report should additional information be made available.

## Table of Contents

I.      INTRODUCTION..................................................................................5
   Overview ......................................................................................................5
   Overview ......................................................................................................5

II.     DEFINITIONS ................................................................................ 11

III.    SUMMARY OF OPINIONS ........................................................... 15

IV.     HUMAN TRAFFICKING OVERVIEW ........................................ 17

V.      LIMITATIONS OF HUMAN TRAFFICKING DATA ................... 21
   Prevalence .................................................................................................. 21
   Evidence-Based Interventions ................................................................... 22
   Sensitivity and Specificity ......................................................................... 24
   Low Specificity ........................................................................................... 24
      Human Trafficking "Indicators" in Aviation..........................................25
      Human Trafficking "Indicators" in Hospitality ......................................27

VI.     MISIDENTIFICATION OF HUMAN TRAFFICKING VICTIMS..................... 31
   Misidentification by Law Enforcement .................................................... 31
   Available Protocols for Identification ...................................................... 33

VII.    SEX TRAFFICKING ...................................................................... 36
   Sex Trafficker Characteristics ................................................................. 36
   Human Trafficking Victim Characteristics .............................................. 36
   Affected Industries .................................................................................... 37

VIII.   ACTUAL OR CONSTRUCTIVE KNOWLEDGE............................ 39

IX.     CASE ALLEGATIONS ................................................................... 41

X.      PROPOSED PLAINTIFF EXPERTS ............................................. 43
   Naeshia McDowell, MPH ......................................................................... 44
      Qualifications .........................................................................................44
      Opinions ................................................................................................45
   Darrell Chaneyfield ................................................................................. 47
      Qualifications .........................................................................................47
      Opinions ................................................................................................48

XI.     SECONDARY EXPLOITATION.................................................... 55

XII.    CONCLUSION ............................................................................... 57

*APPENDIX A. Curriculum Vitae* ....................................................................... *59*

*APPENDIX B. Expert Witness Testimony* ...................................................... *79*

*APPENDIX C. Materials Reviewed and Considered* ..................................... *82*

*APPENDIX D. International Labour Office's Operational Indicators of Commercial Sexual Exploitation of Children* ........................................................... *84*

**TABLE OF FIGURES**

Figure 1. Timeline of Burgeoning Data on Human Trafficking.........................................19
Figure 2. Prostitution Arrests of Juveniles in Georgia by Year..........................................20
Figure 3. Blue Lightning Initiative for Aviation Personnel "Indicators" .........................25
Figure 4. Polaris Project Matrix on Human Trafficking Types by Industry ....................38
Figure 5. Blue Lightning Initiative for Aviation Personnel "Indicators" .........................39
Figure 6. Maslow's Hierarchy of Needs..........................................................................46
Figure 7. Commercial Sex Consumer Discusses Circumventing Staff at IHG Property
Holiday Inn ......................................................................................................................48

**TABLE OF TABLES**

Table 1. Maryland Scientific Methods Scale (SMS)........................................................23
Table 2. Examples of Human Trafficking "Red Flag" Indicia Resulting in False
Allegations and Claims of Racial Profiling.....................................................................25
Table 3. Sample of Blue Campaign "Indicia" and Countervailing Information...............28
Table 4. Strong Trafficking Indicators from the ILO Delphi Survey Compared to Present
Matter................................................................................................................................35
Table 5. Sample of Plaintiff's "Basic Premise" and Overview of Countervailing
Information .......................................................................................................................42
Table 6. Chaneyfield's Opinion 1 Claims and Countervailing Information ....................49
Table 7. Sample of Chaneyfield Red Flags and Countervailing Information .................50

# I.    INTRODUCTION

**Overview**

Overview

I have been engaged by NORTHBROOK INDUSTRIES, INC. D/B/A UNITED INN AND SUITES[2] in the matter of *A.G., v. NORTHBROOK INDUSTRIES, INC. D/B/A UNITED INN AND SUITES.,* 1:20-cv-05231-JPB to provide opinions as an expert on human trafficking. I am being compensated for my review, analysis, and time in this case, as follows:

- Retainer: $10,000
- Review, analysis, and consultation: $1,125/hour
- Travel: $550/hour

My compensation is not contingent upon offering any specific opinions or on the outcome of this matter.

Over the past fifteen years, I have accumulated a variety of work experiences that contribute to my qualifications as an expert on human trafficking (see Appendix A for a copy of my Curriculum Vitae). As the CEO of Break the Chain, LLC and former CEO of Mahn, Mehlman & Associates, LLC, I regularly serve as an expert witness for human trafficking cases (see Appendix B for a list of cases). I also provide *pro bono* expert witness services for human trafficking survivors and currently serve on the advisory network for anti-trafficking non-profit Empower Her Network, where I assisted in building the qualitative measurement tools used by their organization for the last five years.

I am the author of a book on the different forms of human trafficking, which is entitled *Hidden in Plain Sight: America's Slaves of the New Millennium*. For this book, I performed extensive primary and secondary research, including:

(1) A systematic review of over 300 human trafficking cases;
(2) Content analyses on more than 1,000 media reports of human trafficking arrests;
(3) Qualitative interviews of human trafficking victims;
(4) Qualitative interviews of convicted human traffickers;
(5) Qualitative interviews of consenting sex workers; and
(6) Qualitative interviews of commercial sex consumers.

My book was incorporated into the three-day Advanced Human Trafficking Law Enforcement Class curriculum used by ERASE Child Trafficking to train law enforcement in the United States on human trafficking identification and investigation.[3] The book also

---

[2] Herein referred to as Defendant or Defendants.
[3] For example, San Bernardino County Sheriff's Department, San Bernardino Police Department, City of Fontana Police Department, and Redlands Police Department.

received a variety of advanced praise from experts within the field.[4]

In addition, I formally served as an adjunct human trafficking subject matter expert for RAND Corporation, a non-profit institution that helps improve policy and decision-making through research and analysis, where I worked on three study proposals:

> (1) Research design to evaluate the National Human Trafficking Hotline;
> (2) Development of an evidence-based human trafficking risk assessment tool for organizations working with minors; and
> (3) Evaluating the outcomes of housing services for adult and juvenile human trafficking survivors.

In these capacities, I have had the opportunity to train various law enforcement agencies around the country on my human trafficking research for investigations, including Homeland Security Investigations in Buffalo, New York; Montebello Police Department in Montebello, California; the North Carolina State Bureau of Investigation; and the Royal Canadian Mounted Police in Halifax, Nova Scotia, among others. I have also presented my research at various human trafficking summits and conferences and served on the Greater Prince William County Human Trafficking Task Force (GPWCHTTF) as the data collection sub-committee chair, as well as on the Prince George's County Human Trafficking Task Force. In 2019, I served as an invited panelist for the Police Executive Research Forum's *Critical Issues in Policing Conference—The Police Response to Human Trafficking*, which led to a published report in 2020.[5]

I have conducted primary research into recruitment and control schemes, advertisements, the mechanics of commercial sex exchanges, and the distinction between sex trafficking and consenting commercial sex. Various aspects of my research have been presented to law enforcement agencies, including but not limited to special agents for Homeland Security Investigations in Buffalo, New York; fire marshals in Fairfax, Virginia; and law enforcement officers in Martin County and Palm Beach County.

In addition to my work on human trafficking, I have received formal training, as well as quantitative and qualitative research experience, during my graduate coursework at George Mason University. Specifically, I served as a research associate on the Trinidad and Tobago Crime Reduction Project, which involved government-sanctioned surveys of both police officers and members of the community in Trinidad. I also led participant outreach for the Office of Juvenile Justice and Delinquency Prevention (OJJDP) Census of Juveniles on Probation and served as the Clinical Trial Search Coordinator for the Cochrane[6] Justice

---

[4] For example, from Louise I. Shelley, Omer L. and Nancy Hirst Professor of Public Policy at the Schar School of Policy and Government at George Mason University in Virginia and Director, Terrorism, Transnational Crime and Corruption Center and John Cotton Richmond, Former Federal Human Trafficking Prosecutor and Founding Director of the Human Trafficking Institute.

[5] *How Local Police Can Combat the Global Problem of Human Trafficking: Collaboration, Training, Support for Victims, and Technology Are Keys to Success*, Police Executive Research Forum (PERF) (2020), retrieved from: https://www.policeforum.org/assets/CombatHumanTrafficking.pdf.

[6] The Cochrane Library is a collection of high-quality, independent evidence to inform healthcare decision-making.

Health Field.

In addition to my practical and research experience, I also formally taught about human trafficking as part of my course material at George Mason University and at University of Maryland, College Park, the #1 ranked criminology doctoral program in the nation.[7]

I hold a Ph.D. in Criminology, Law and Society from George Mason University, as well as a M.S. in Justice, Law, and Crime Policy and a B.S. *cum laude* in Administration of Justice.

My research on the efficacy of anti-trafficking interventions has been published in the *Journal of Social Inclusion*,[8] which was guest edited by leading human trafficking expert Siddharth Kara, an Adjunct Lecturer at Harvard University and author of "Sex Trafficking: Inside the Business of Modern Slavery." My qualitative interviews with convicted human traffickers were also published in the journal *Trends and Organized Crime*.[9] Additionally, my work has also been published through magazines such as the *Diplomatic Courier*[10] and in media outlets, such as *USA Today*,[11] *Politico*,[12] *The Houston Chronicle*,[13] *The Hill*,[14]

---

[7] While at University of Maryland, College Park, I contributed to and was named as a faculty member for the U.S. Department of Homeland Security, U.S. Customs and Border Protection, CBP Leadership Institute grant proposal, which was awarded in 2014.

[8] Kimberly Mehlman-Orozco, *Safe Harbor Policies for Juvenile Victims of Sex Trafficking: A Myopic View of Improvements in Practice*, 3 Social Inclusion 52 (2015).

[9] Kimberly Mehlman-Orozco, *Projected Heroes and Self-Perceived Manipulators: Understanding the Duplicitous Identities of Human Traffickers*, 23 Trends in Organized Crime 95, 105-106 (2017).

[10] See, for example, Kimberly Mehlman-Orozco, *America's Symbolic, Not Effective, Anti-Trafficking Policy*, Diplomatic Courier (May 31, 2016), retrieved from:
https://www.diplomaticourier.com/posts/americas-symbolic-not-effective-anti-trafficking-policy; Kimberly Mehlman-Orozco, *Sex Slaves or Prostitutes?: How Human Trafficking is Hidden in Plain Sight in America's Capital*, Diplomatic Courier (May 4, 2016), retrieved from:
https://www.diplomaticourier.com/posts/sex-slaves-prostitutes-human-trafficking-hidden-plain-sight-americas-capital; or Kimberly Mehlman-Orozco, *Devoid of Research: An Evaluation of Human Trafficking Interventions*, Diplomatic Courier (Mar. 18, 2014), retrieved from:
https://www.diplomaticourier.com/posts/devoid-of-research-an-evaluation-of-human-trafficking-interventions.

[11] See, for example, Kimberly Mehlman-Orozco, *Jeffrey Epstein's deal with Alexander Acosta wasn't out of line with what I have seen*, USA Today (July 10, 2019), retrieved from:
https://www.usatoday.com/story/opinion/2019/07/10/jeffrey-epstein-alexander-acosta-donald-trump-sex-trafficking-agreement-column/1686687001/; and Kimberly Mehlman-Orozco and William Snyder, *Robert Kraft spa scandal: Sex trafficking is hard to prove, that doesn't mean it's a lie*, USA Today (Apr. 4, 2019), retrieved from: https://www.usatoday.com/story/opinion/2019/04/04/robert-kraft-lawyers-sex-trafficking-conviction-difficult-column/3325857002/.

[12] See, for example, Kimberly Mehlman-Orozco, *How to Fight Sex Trafficking*, Politico (Feb. 24, 2019), retrieved from: https://www.politico.com/magazine/story/2019/02/24/sex-trafficking-225203/.

[13] See, for example, Kimberly Mehlman-Orozco and Simon Hedlin, *Mehlman-Orozco, Hedlin: Stop criminalizing victims of sex trafficking*, The Houston Chronicle (Jan. 19, 2017), retrieved from:
https://www.houstonchronicle.com/opinion/outlook/article/Mehlman-Orozco-Hedlin-Stop-criminalizing-10869881.php.

[14] See, for example, Kimberly Mehlman-Orozco and William D. Snyder, *Legalizing prostitution could end sex-trafficking investigations*, The Hill (March 19, 2019), retrieved from:
https://thehill.com/opinion/criminal-justice/434272-legalizing-prostitution-could-end-sex-trafficking-investigations/#:~:text=Research%20suggests%20that%20legalization%20would,it%20would%20hamper

*The Washington Post*,[15] *The Baltimore Sun*,[16] *The Crime Report*,[17] *Thomson Reuters*,[18] and

%20trafficking%20investigations; Kimberly Mehlman-Orozco, *Trafficking victims get lost under unjust criminal convictions*, The Hill (Dec. 8, 2017), retrieved from: https://thehill.com/opinion/civil-rights/363902-trafficking-victims-get-lost-under-unjust-criminal-convictions/; Kimberly Mehlman-Orozco, *Decriminalize sex work to bring trafficking victims out of the shadows*, The Hill (Oct. 21, 2017), retrieved from: https://thehill.com/opinion/civil-rights/356512-decriminalize-sex-work-to-bring-trafficking-victims-out-of-the-shadows/; Kimberly Mehlman-Orozco, *Sex Trafficking is often hidden in plain sight*, The Hill (Oct. 21, 2016), retrieved from: https://thehill.com/blogs/pundits-blog/immigration/302150-sex-trafficking-is-often-hidden-in-plain-sight/; and Kimberly Mehlman-Orozco, *What happens after a human trafficking victim is 'rescued'?*, The Hill (July 29, 2016), retrieved from: https://thehill.com/blogs/congress-blog/judicial/289709-what-happens-after-a-human-trafficking-victim-is-rescued/.

[15] See, for example, Kimberly Mehlman-Orozco, *Decriminalizing sex work would help bring victims out of the shadows*, The Washington Post (Dec. 20, 2017), retrieved from: https://www.washingtonpost.com/opinions/decriminalizing-sex-work-would-help-bring-victims-out-of-the-shadows/2017/10/20/4b7d8be8-b38a-11e7-9b93-b97043e57a22_story.html; and Kimberly Mehlman-Orozco, *Vilifying Backpage.com won't help fight sex trafficking*, The Washington Post (July 18, 2017), retrieved from https://www.washingtonpost.com/opinions/vilifying-backpagecom-wont-help-fight-sex-trafficking/2017/07/18/101b0d34-6b12-11e7-abbc-a53480672286_story.html.

[16] See, for example, Kimberly Mehlman-Orozco, *Sex trafficking bill likely to do more harm than good*, The Baltimore Sun (March 22, 2018), retrieved from: https://www.baltimoresun.com/opinion/op-ed/bs-ed-op-0323-fosta-trafficking-20180322-story.html; Kimberly Mehlman-Orozco, *What every parent should know about sex trafficking*, Baltimore Sun (Mar. 28, 2017), retrieved from: https://www.baltimoresun.com/opinion/op-ed/bs-ed-sex-trafficking-20170328-story.html; and Kimberly Mehlman-Orozco, *Consenting prostitutes or trafficked victims?*, Baltimore Sun (June 19, 2016), retrieved from: https://www.baltimoresun.com/opinion/op-ed/bs-ed-sex-trafficking-20160619-story.html.

[17] See, for example, Jennifer Lowery-Keith and Kimberly Mehlman-Orozco, *'Justice Denied': A Sex Trafficking Survivor Tells Her Story*, The Crime Report (Feb. 28, 2022), retrieved from: https://thecrimereport.org/2022/02/28/justice-denied-a-sex-trafficking-survivor-tells-her-story/; Kimberly Mehlman-Orozco and Greg Bristol, *Suing Social Media Sites Won't Curb Sex Trafficking: Advocates*, The Crime Report (Nov. 30, 2021), retrieved from: https://thecrimereport.org/2021/11/30/suing-social-media-sites-wont-curb-sex-trafficking-advocates/; Kimberly Mehlman-Orozco and Marisa Trasatti, *Does 'Nirvana' Lawsuit Undermine Struggle Against Trafficking?*, The Crime Report (Aug. 31, 2021), retrieved from: https://thecrimereport.org/2021/08/31/does-nirvana-lawsuit-undermine-struggle-against-trafficking/; Kimberly Mehlman-Orozco, *The 'Racialization' of Sex Trafficking in America*, The Crime Report (May 4, 2021), retrieved from: https://thecrimereport.org/2021/05/04/1294014/; Kimberly Mehlman-Orozco, *COVID-19, the Commercial Sex Industry and Sex Trafficking*, The Crime Report (Mar. 22, 2021), retrieved from: https://thecrimereport.org/2021/03/22/covid-19-the-commercial-sex-industry-and-sex-trafficking/; Kimberly Mehlman-Orozco, *Why the Stop Enabling Sex Traffickers Act is the Wrong Solution*, The Crime Report (Sept. 13, 2017), retrieved from: https://thecrimereport.org/2017/09/13/why-the-stop-enabling-sex-traffickers-act-is-the-wrong-solution/; Kimberly, Mehlman-Orozco, *Child Trafficking: The Tragedy of 'Princess'*, The Crime Report (July 10, 2017), retrieved from: https://thecrimereport.org/2017/07/10/child-trafficking-the-tragedy-of-princess/; Kimberly Mehlman-Orozco, *Hunting the Internet's Sex Predators*, The Crime Report (June 14, 2017), retrieved from: https://thecrimereport.org/2017/06/14/hunting-the-internets-worst-predators/; Kimberly Mehlman-Orozco, *Sex Trafficking: A Surprising Rescue Story*, The Crime Report (May 17, 2017), retrieved from: https://thecrimereport.org/2017/05/17/sex-trafficking-a-surprising-rescue-story/; and Kimberly Mehlman-Orozco, *Why Do We Criminalize Young Victims of Sex Trafficking?*, The Crime Report (Jan. 17, 2017), retrieved from: https://thecrimereport.org/2017/01/17/why-do-we-criminalize-young-victims-of-sex-trafficking/.

[18] Kimberly Mehlman-Orozco, *Why cracking down on websites won't stop online sex trafficking*, Thomson Reuters Foundation (Mar. 2, 2018), retrieved from: https://news.trust.org/item/20180302174534-se03q/; Kimberly Mehlman-Orozco, *Why we should question the FBI's recent human trafficking sting*, Thomson Reuters Foundation (Oct. 24, 2017), retrieved from: https://news.trust.org/item/20171024161910-x96o5; Kimberly Mehlman-Orozco, *To sue or not to sue third-party businesses for sex trafficking?*, Thomson Reuters Foundation (July 3, 2017), retrieved from: https://news.trust.org/item/20170703203545-k6b8z; and

others. Moreover, I am frequently interviewed and consulted by the media on topics related to human trafficking; for example, most recently by *Forbes*,[19] as well as by CNN, NBC, CBS, Fox News, among others.

I also serve as a peer-reviewer for empirical research articles on human trafficking, for example with the *Journal of Human Trafficking* and *American Journal of Evaluation* and I serve as a peer-reviewer for grant applications for human trafficking research. Most recently, I was invited by the *Journal of Human Trafficking* to review a manuscript entitled "*A Quasi-Experimental Intervention Trial to Test the Efficacy of a Human Trafficking Awareness Campaign: The Blue Campaign.*" Additionally, in June 2022, I served as an invited peer-reviewer for the U.S. Department of Justice, Office of Justice Programs, National Institute of Justice Research and Evaluation on Trafficking in Persons. Previously, I was invited by the Office of Justice Programs and National Institute of Justice to serve as a peer-reviewer for FY 2020 Research on Law Enforcement Responses to Sex Trafficking of Minors.

At present, I have testified in court for a total of ten cases:

1. Five cases in state criminal court in California[20];
2. One case in federal criminal court in California[21];
3. One case in federal criminal court in New Mexico[22];
4. One case in state criminal court in New York[23];
5. One case in state criminal court in Virginia[24]; and
6. One case in federal civil court in Virginia.[25]

I have also sat for depositions for a total of eight civil cases:

1. Three cases in state civil court in Georgia;
2. Two cases in federal civil court in New York;
3. One case in federal civil court in Virginia;
4. One case in federal civil court in California; and
5. One case in federal civil court in Oklahoma.

Additionally, there are four orders recognizing the admissibility of my expert witness testimony:

---

Kimberly Mehlman-Orozco, *Will shutting down Backpage.com end the scourge of child sex trafficking in America?*, Thomson Reuters Foundation (May 30, 2017), retrieved from: https://news.trust.org/item/20170530154532-pjag0.

[19] Thomas Brewster, *Sex Traffickers Used America's Favorite Family Safety App To Control Victims*, Forbes (April 6, 2023), retrieved from: https://www.forbes.com/sites/thomasbrewster/2023/04/06/sex-traffickers-use-parenting-apps-like-life360-to-spy-on-victims/?sh=92d15c864c3a.

[20] All five were at trial.

[21] Trial.

[22] At a Daubert hearing only, where I was admitted. Case was resolved through plea bargain.

[23] At Frye hearing only for another expert, Chitra Raghavan.

[24] At a Daubert hearing only, where I was admitted, but court did not issue a written order.

[25] Trial.

1. One case in federal civil court in Virginia[26];
2. Two cases in federal criminal court in New Mexico; and
3. One case in federal criminal court in California.

---

[26] Note: I was also admitted in state court in Virginia, but the challenge was withdrawn before an order was issued.

## II.   DEFINITIONS

In order to facilitate precision in language, which is undoubtedly important when evaluating the present claims, I proffer the following definitions, which reflect either a commonly accepted understanding of key concepts in the sex trafficking literature or social scientific research, or definitions from the United States Code and Georgia Penal Code, as referenced in my report.

**Sex Trafficking**: The recruitment, harboring, transportation, provision, obtaining, patronizing, or soliciting of a person for the purpose of a commercial sex act and in which the commercial sex act is induced by force, fraud, or coercion or in which the person induced to perform such act has not attained 18 years of age.[27]

**Sexual Servitude:** any sexually explicit conduct or performance involving sexually explicit conduct for which anything of value is directly or indirectly given, promised to, or received by any individual, which conduct is induced or obtained:
A.  By coercion or deception;
B.  From an individual who is under the age of 18 years;
C.  From an individual whom the accused believes to be under the age of 18 years;
D.  From an individual who has a developmental disability; or
E.  From an individual whom the accused believes to have a developmental disability[28].

**Commercial Sex Act:** Any sex act on account of which anything of value is given to or received by any person.[29]

**Coercion:** the term "coercion" means: (A) threats of serious harm to or physical restraint against any person; (B) any scheme, plan, or pattern intended to cause a person to believe that failure to perform an act would result in serious harm to or physical restraint against any person; or (C) the abuse or threatened abuse of the legal process.[30]

---

[27] 22 U.S.C. § 7102(11)(A), (12).
[28] GA Code § 16-5-46 (2020).
[29] 22 U.S.C. § 7102(4).
[30] 22 U.S.C. § 7102(3). Similarly, per GA Code § 16-5-46 (2020) the term: "Coercion" means:
   A.   Causing or threatening to cause bodily harm to any individual, physically restraining or confining any individual, or threatening to physically restrain or confine any individual;
   B.   Exposing or threatening to expose any fact or information or disseminating or threatening to disseminate any fact or information that would tend to subject an individual to criminal or immigration proceedings, hatred, contempt, or ridicule;
   C.   Destroying, concealing, removing, confiscating, or possessing any actual or purported passport or other immigration document, or any other actual or purported government identification document, of any individual;
   D.   Providing a controlled substance to such individual for the purpose of compelling such individual to engage in labor or sexual servitude against his or her will; or
   E.   Causing or threatening to cause financial harm to any individual or using financial control over any individual.

**Deception:** the term "deception" means: (A) Creating or confirming another's impression of an existing fact or past event which is false and which the accused knows or believes to be false; (B) Maintaining the status or condition of an individual arising from a pledge by such individual of his or her personal services as security for a debt, if the value of those services as reasonably assessed is not applied toward the liquidation of the debt or the length and nature of those services are not respectively limited and defined, or preventing an individual from acquiring information pertinent to the disposition of such debt; or (C)Promising benefits or the performance of services which the accused does not intend to deliver or perform or knows will not be delivered or performed. Evidence of failure to deliver benefits or perform services standing alone shall not be sufficient to authorize a conviction under this Code section[31].

**Sex Trafficker:** a person who induces an adult to perform a commercial sex act through the use of force, fraud, coercion, abduction, threat, or deception; or induces anyone who has not attained 18 years of age to perform a commercial sex act.

**Sex Trafficking Victim:** a person who has been subjected to trafficking of persons, § 5-18-103, or a person who is induced into a commercial sex act through force, fraud, coercion, abduction, threat, or deception; or any person induced into a commercial sex act, who has not attained 18 years of age.

**Consenting Sex Worker:** an adult who chooses to engage in sexual activities in exchange for payment, without being forced, defrauded, coerced, abducted, threatened, or deceived. Also referred to as a prostitute or whore[32].

**Survival Sex:** trading commercial sex for money, drugs, *or other needs[33]*.

**Trick:** committing an act of prostitution (verb), or the person buying it (noun)[34]. A victim is said to be "turning a trick" or "with a trick."[35]

**Commercial Sex Consumer:** An individual who patronizes sex workers. Synonyms: monger, John, hobbyist, or trick.[36]

**Bottom:** Female victim of a sex trafficker who has been indoctrinated enough to facilitate the recruitment, control, and exploitation of other sex workers despite being exploited

---

[31] Per GA Code § 16-5-46 (2020).

[32] Gira Grant, Melissa. (2014). Playing the Whore: The Work of Sex Work. Verso.

[33] Clingan, S. E., Fisher, D. G., Reynolds, G. L., Janson, M. A., Rannalli, D. A., Huckabay, L., & Nguyen, H. D. (2020). Survival Sex Trading in Los Angeles County, California, USA. Journal of sex research, 57(7), 943–952. https://doi.org/10.1080/00224499.2019.1703885

[34] A "commercial sex consumer" can be referred to as a "John" or a "Trick" by sex traffickers, victims of sex trafficking, or consenting sex workers; however, these men generally refer to themselves as "mongers" or "hobbyists."

[35] Shared Hope International. N.d. Human Trafficking Terms. Retrieved from: https://sharedhope.org/the-problem/trafficking-terms/

[36] Mehlman-Orozco, K., *Hidden in Plain Sight: America's Slaves of the New Millennium*, Praeger (2017).

herself.  When and if the Bottom also significantly benefits from the financial exploitation of other victims, she may be considered a sex trafficker by law enforcement.[37]

**GFE:** An Acronym for "Girlfriend Experience— A commercial sex companionship that mimics a conventional relationship, in addition to sexual services[38].

**Venture:** defined in Section 1591(e) as "any group of two or more individuals associated in fact, whether or not a legal entity[39]."

**Family/Folks**: the term used to describe the other individuals under the control of the same pimp. He plays the role of father (or "Daddy") while the group fulfills the need for a "family."[40]

**The Game/The Life:** the subculture of prostitution, complete with rules, a hierarchy of authority, and language. Referring to the act of pimping as 'the game' gives the illusion that it can be a fun and easy way to make money, when the reality is much harsher. Women and girls will say they've been "in the life" if they've been involved in prostitution for a while.[41]

**Two-Call System:** a commercial sex exchange tactic to evade third party detection. The commercial sex consumer will call twice for in-call commercial sex providers: first, to set up an appointment time and obtain general directions to the in-call location, and second, to obtain specific information on which hotel room or apartment the sexual services will be provided.[42]

**In-Call:** any location where the commercial sex consumer travels to the commercial provider for services, such as the sex worker's place of residence or hotel room.

**Out-Call:** any location where the commercial sex worker travels to the consumer for services, such as the hobbyist or monger's place of residence or hotel room. Also known as TOS or "take-out service."

**Trap Phone:** A prepaid cellular telephone utilized for illicit exchanges, including but not limited to the sale of drugs or commercial sex.

**Trap House:** A house, townhouse, or apartment where illicit exchanges occur, including but not limited to the sale of drugs or commercial sex.

**Track/Blade:** An area where commercial sex is advertised outside.

---

[37] *Id.*
[38] Mehlman-Orozco, K., *Hidden in Plain Sight: America's Slaves of the New Millennium*, Praeger (2017).
[39] " 18 U.S.C. § 1591(e)(5)" *Noble v. Weinstein*, 335 F. Supp. 3d 504, 524 (S.D.N.Y. 2018)
[40] Mehlman-Orozco, Kimberly. (2017). Hidden in Plain Sight: America's Slaves of the New Millennium. Praeger.
[41] *Ibid.*
[42] *Ibid.*

**Exploit:** Benefit unfairly from the work of (someone), typically by overworking and underpaying them.

**Venture:** Defined in Section 1591(e)(6) of the TVPA as "any group of two or more individuals associated in fact, whether or not a legal entity."[43]

**Ecological Fallacy:** Inferences about the characteristics/behavior of individuals are derived from inferences about the group to which the individuals belong.[44]

**Fallacy of Composition**: The error of assuming that what is true of a member of a group is true for the group as a whole.

**Facilitate**: To make (an action or process) easy or easier.

**Sensitivity:** The ability of law enforcement, service providers, and other third parties to correctly identify true victims of human trafficking (true positive).

**Specificity:** The ability of law enforcement, service providers, and other third parties to correctly identify persons who are not victims of human trafficking (true negative).

**Methodology:** The specific methods, procedures, or practices needed to derive or interpret data within the scope of a particular discipline.

**Reliability:** The degree to which the result of a methodology can be depended on to be accurate (e.g., through the overall consistency of a measure by using a statistical approach).

**Confirmation Bias:** The tendency to process information by looking for, or interpreting, information that is consistent with an existing belief.

**Hindsight Bias:** The tendency, upon learning an outcome of a criminal case to overestimate a third party's ability to have foreseen the crime.

**Secondary Exploitation:** The act of making use of or benefiting from a human trafficking survivor's victimization or the human trafficking phenomenon.[45]

**Sensitivity:** The ability of law enforcement, service providers, and other third parties to correctly identify true victims of human trafficking (true positive).

**Specificity:** The ability of law enforcement, service providers, and other third parties to correctly identify persons who are not victims of human trafficking (true negative).

---

[43] 18 U.S.C. § 1591(e)(6); *Noble v. Weinstein*, 335 F. Supp. 3d 504, 524 (S.D.N.Y. 2018).
[44] J.T. Walker, "Ecological fallacy," 2 Encyclopedia of Research Methods in Criminology and Criminal Justice, 478-482 (2021).
[45] See, for example, Mehlman-Orozco, K., *Hidden in Plain Sight: America's Slaves of the New Millennium*, Praeger (2017) and Cojocaru, Claudia. *My experience is mine to tell: Challenging the abolitionist victimhood framework*. Anti-Trafficking Review 7 (2016): 12-38.

## III.   SUMMARY OF OPINIONS[46]

a.  Sex trafficking is a clandestine crime.

b.  Sex trafficking victims are difficult to identify and are frequently misidentified.

c.  As a consequence of misidentification, sex trafficking victims are often erroneously criminalized by the judicial system.

d.  Indicia of prostitution are often erroneously conflated with indicia of sex trafficking.

e.  Minors involved in the commercial sex industry continue to be criminalized by law enforcement for crimes such as prostitution.

f.  Indicia of "sex trafficking" in the hospitality industry have not been adequately evaluated for sensitivity or specificity.

g. I am not aware of any reliable or generally accepted empirical research to estimate the prevalence of sex trafficking at hotels or motels in the United States.

h. I am not aware of any reliable or generally accepted empirical research that adequately evaluates the efficacy of the Blue Campaign signs and indicators of sex trafficking or the efficacy of training on the prevention of sex trafficking.

i.  I am not aware of any reliable or generally accepted empirical research that adequately evaluates the efficacy of the ECPAT signs and indicators of sex trafficking or the efficacy of training on the prevention of sex trafficking.

j.  I am not aware of any human trafficking training that has been empirically validated, with high rates of sensitivity and specificity.

k. To a reasonable degree of social scientific certainty, there is not empirical evidence to suggest that extant anti-trafficking interventions for hoteliers would have had a statistically significant effect on the prevalence of sex trafficking or the identification of victims or offenders.

l.  To a reasonable degree of social scientific certainty, mandatory training would not have led to the Plaintiff's identification as a victim.

m.  Many extant anti-trafficking interventions and trainings for hoteliers are based on

---

[46] All of my opinions are stated to a reasonable degree of social scientific certainty in my profession as an expert in human trafficking and Ph.D. educated criminologist.

misinformation, unsupported speculation or subjective belief, or ecological fallacies, and are not supported by reliable principles and scientific methods.

n. Based on the evidence in this case and my expertise on the identification of sex trafficking victims, it is not reasonable for the Plaintiff's proposed experts to conclude that the Defendant knew or should have known that the Plaintiff was a victim of sex trafficking.

o. Many of the opinions levied by the Plaintiff's proposed experts are based on misinformation, unsupported speculation or subjective belief, or ecological fallacies, and are not supported by reliable principles and scientific methods.

The following sections of this report provide a summary and further explanation as to the evidentiary, empirical, and theoretical basis for each of the aforementioned opinions:

*Section IV. Provides an overview on human trafficking;*

*Section V. Explores the limitations of human trafficking data;*

*Section VI. Highlights the challenges related to identification and intervention;*

*Section VII. Discusses sex trafficking characteristics and interactions with various industries;*

*Section VIII. Reviews actual or constructive knowledge standards regarding third-party liability trafficking claims;*

*Section IX. Outlines the present case allegations in the context of state-of-the-science data;*

*Section X. Rebuts the testimony of the Plaintiff's named experts;*

*Section XI. Discusses secondary exploitation of human trafficking; and*

*Section XII. Summarizes the opinions in the conclusion.*

## IV.   HUMAN TRAFFICKING OVERVIEW

Human trafficking generally refers to the recruitment, transportation, transfer, harboring or receipt of persons, by means of threat, force, coercion, abduction, fraud, or deception, for the purpose of exploitation. Juveniles, unlike adults, cannot consent to exploitation and therefore *should* be considered victims of trafficking if they were exploited[47]. This definition encompasses two general forms of human trafficking: labor trafficking and sex trafficking.

Labor trafficking is defined as the recruitment, harboring, transportation, provision, or obtaining of a person for labor or services through the use of force, fraud, or coercion for the purpose of subjection to involuntary servitude, peonage, debt bondage, or slavery[48].

Sex trafficking, on the other hand, is defined as when a commercial sex act is induced by force, fraud, or coercion, or in which the person induced to perform such act has not attained 18 years of age[49].

The modern concept of human trafficking did not start becoming internationally popularized until the year 2000.

On October 28, 2000, the U.S. Congress enacted the Trafficking Victims Protection Act (TVPA), which set up actions to combat trafficking in persons. Specifically:

1. Coordinate and monitor anti-trafficking activities through an interagency task force;
2. Prevent human trafficking through vocational training, education, and human trafficking public awareness campaigns;
3. Protect human trafficking survivors by not detaining them in correctional facilities, providing them with medical care and other assistance, and protecting them and their families from revictimization and/or deportation; and
4. Strengthening prosecution and punishment of human traffickers[50].

Less than two months after the TVPA was adopted in the United States, the United Nations met in Palermo, Italy, and adopted the Protocol to Prevent, Suppress and Punish Trafficking in Persons, Especially Women and Children, Supplementing the United Nations Convention Against Transnational Organized Crime—colloquially known as the Palermo Protocol. The purpose of the protocol was threefold:

---

[47] Although juveniles *should* be considered victims of trafficking if they were exploited, commercially sexually exploited minors continue to be criminalized in the United States. This is mostly likely due to the fact that some minors involved in commercial sex are not actively exploited, but instead are engaging in "survival sex."

[48] Victims of Trafficking and Violence Protection Act of 2000, Pub. L. No. H.R. 3244 (2000). http://www.state.gov/j/tip/laws/61124.htm

[49] *Ibid.*

[50] *Ibid.*

1. To prevent and combat trafficking in persons, paying particular attention to women and children;
2. To protect and assist the victims of such trafficking, with full respect for their human rights; and
3. To promote cooperation among states' parties in order to meet those objectives[51].

Since 2000, there has been a substantial increase in public awareness of human trafficking. There are more anti-trafficking task forces, hotlines, and survivor services than ever before. In addition to federal legislation, more states have also passed legislation to combat trafficking.

For example, Georgia has passed legislation:

1. Criminalizing trafficking at the state level in 2007[52];
2. Providing "safe harbor" for certain victims of sex trafficking in 2015[53]; and
3. Allowing victims of human trafficking to pursue civil remedy in 2021[54].

However, there are still critical gaps between the human trafficking narrative, reality, and policy. Although more people are aware of the human trafficking concept, few understand how this crime manifests in real life, and there is little empirical data to support generalizable information. Typically, victims are coerced, defrauded, and deceived into exploitive situations, where they are manipulated into complacency. Many organizations and anti-trafficking authorities provide information on how to identify the red flags of human trafficking; however, these "red flags" are not yet empirically tested for sensitivity and specificity, especially in the hospitality industry, and even trained law enforcement and service providers frequently misidentify victims (Figure 1 illustrates the burgeoning knowledge on human trafficking, which remains in development).

---

[51] Protocol to Prevent, Suppress and Punish Trafficking in Persons, Especially Women and Children, Supplementing the United Nations Convention Against Transnational Organized Crime. (2000).

[52] Georgia's Human Trafficking Law (OCGA 16-5-46, effective July 1, 2007) makes it illegal for those who "knowingly subjects or maintains another or knowingly recruits, entices, harbors, transports, provides, or obtains by any means another person for the purpose of sexual servitude." Citation: https://www.fultoncountyga.gov/inside-fulton-county/fulton-county-initiatives/end-human-trafficking

[53] Senate Bill 8. Safe Harbor/Rachel's Law Act. Available here: https://www.courttrax.org/DynamicContentRoot/Legislation/SB8-2015.pdf

[54] See Senate Bill 33. O.C.G.A. § 51-1-56. For example, see: https://readingroom.law.gsu.edu/cgi/viewcontent.cgi?article=3115&context=gsulr



**Figure 1. Timeline of Burgeoning Data on Human Trafficking**

Issues with misidentification may be, in part, due to vague and sometimes conflicting legal definitions.

For example, Georgia's Human Trafficking Law OCGA 16-5-46 makes it illegal for those who "knowingly subjects or maintains another or knowingly recruits, entices, harbors, transports, provides, or obtains by any means another person for the purpose of sexual servitude."

This definition may lead to confusion on who is considered a consenting sex worker versus a victim of human trafficking, which can lead to misidentification, even among trained law enforcement and even for minors.

For example, according to data from the FBI Uniform Crime Report[55], between 20-35 juveniles were arrested for prostitution or commercialized vice in Georgia per year from 2011-2014, which likely continued even after the passage Georgia's Safe Harbor law in 2015[56].

---

[55] Data retrieved from OJJDP's EZAUCR. Available here:
https://www.ojjdp.gov/ojstatbb/ezaucr/asp/ucr_display.asp
[56] For example, see: Mehlman-Orozco, Kimberly. "Safe Harbor legislation for juvenile victims of sex trafficking: A myopic view of improvements in practice." Social Inclusion 3.1 (2015): 52-62.



**Figure 2. Prostitution Arrests of Juveniles in Georgia by Year**

# V.   LIMITATIONS OF HUMAN TRAFFICKING DATA

## *Prevalence*

While social science researchers have begun to use qualitative data to develop themes on the recruitment and control techniques that are utilized by human traffickers, quantitative statistics should be discussed with caution. Although anti-trafficking advocates and the media cite data on the prevalence and characteristics of human trafficking crimes, a growing body of research suggests that these statistics are questionable at best, due to a combination of methodological weaknesses and gaps in data, among a number of other discrepancies.[57] Despite increases in anti-trafficking law enforcement and legislative initiatives, social scientists have continued to experience difficulty in empirically evaluating the largely unobserved crime of human trafficking.[58] Organizations influencing anti-trafficking legislation make robust claims on the prevalence of this crime, the efficacy of interventions, and the need for legislative changes; however, researchers caution "inadequate data collection methods might result in descriptions that have little to do with reality."[59]

For example, in 2013, The U.S. Department of State Trafficking in Persons Report suggested that there were as many as 27 million men, women, and children being trafficked at any given time. However, that statistic was later debunked. In response, a State Department official said, "The major problem we have always faced with human trafficking is finding good data. For now, this is still a guesstimate, but the best guesstimate there is."[60] In addition to prevalence estimates, authorities have been caught citing erroneous statistics on the characteristics of victims[61] and the amount of illicit income from human trafficking enterprises.[62]

Although there are new efforts to track incidents, arrests, and criminal offenses related to human trafficking, prevalence estimates are still lacking in the United States. Despite promises to standardize data from law enforcement about human trafficking, reported cases

---

[57] Chuang, J.A., *Exploitation Creep and the Unmaking of Human Trafficking Law*, The American Journal of International Law, 108 (4): 609-659 (2014); Cwikel, J., & Hoban, E., *Contentious issues in research on trafficked women working in the sex industry: study designs, ethics and methodology*, Journal of Sex Research, 42(4), 306-316 (2005); Goodey, J., *Human trafficking: sketchy data and policy responses*, Criminology & Criminal Justice, 8(4), 421-442 (2008); Van der Laan, P. H., Smit, M., et al., *Cross-border Trafficking In Human Beings: Prevention and Intervention Strategies for Reducing Sexual Exploitation*. Campbell Systematic Reviews (2011); Weitzer, R., *The Movement to Criminalize Sex Work in the United States*, Journal of Law and Society, 37 (1): 61-84 (2010).

[58] Brunovskis, A., & Tyldum, G., *Describing the Unobserved: Methodological Challenges in Empirical Studies on Human Trafficking*, International Migration, 43 (1-2): 17-34 (2005).

[59] *Ibid*, at 17.

[60] Kessler, G., *Why you should be wary of statistics on 'modern slavery' and 'trafficking*,' The Washington Post (Apr. 24, 2015), available at: https://www.washingtonpost.com/news/fact-checker/wp/2015/04/24/why-you-should-be-wary-of-statistics-on-modern-slavery-and-trafficking/.

[61] Kessler, G., *Indiana AG touts a debunked and rejected 'fact' on sex trafficking*, The Washington Post (June 8, 2016).

[62] Kessler, G., *The false claim that human trafficking is a '$9.5 billion business' in the United States*, The Washington Post (June 2, 2015).

are still remarkably low and there is a large gulf between these data and the prevalence estimates purported by anti-trafficking advocates.[63]

### Evidence-Based Interventions

In addition to the dearth of research on human trafficking prevalence, evidence-based interventions have yet to be identified.

Within the field of criminology, it is generally accepted that randomized controlled trials (experiments) are considered the gold-standard—the highest quality research—for evaluating the effectiveness of an intervention. In order to promote more evidence-based interventions to effectively combat crime, criminologists have taken a distinct "experimental turn" and the sheer number of quantitative experiments in criminology has increased dramatically in recent decades. [64] Most evidence-based criminological interventions have dozens of experiments supporting their efficacy. For example, Braga, Welsh, and Schnell (2015) conducted a meta-analysis of 30 randomized experimental and quasi-experimental tests of disorder policing.[65] However, there is remarkably less research evaluating the efficacy of human trafficking interventions, including trainings.

In an assessment of extant research, Van der Laan et. al. (2011) conducted a systematic review of evaluations for interventions aimed to prevent and suppress trafficking in human beings in conjunction with the Campbell Collaboration. [66] The search identified 144 studies, but there was no methodologically rigorous evaluation of interventions aimed to prevent and suppress trafficking in human beings[67]. Therefore, the researchers could not draw any conclusions on actual outcomes or impacts of these interventions.[68]

In order to be considered "high quality," a study would at least need to have a level 3 on the Maryland Scientific Methods Scale (SMS) (see Table 1).

---

[63] Farrell, A. & Reichert, J., *Using U.S. Law-Enforcement Data: Promise and Limits in Measuring Human Trafficking*, Journal of Human Trafficking, 3 (1) 39-60 (2017).

[64] Sampson, R.J., *Gold Standard Myths: Observations on the Experimental Turn in Quantitative Criminology*, J. Quantitative Criminology, 26, 489–500 (2010), available at: https://doi.org/10.1007/s10940-010-9117-3.

[65] Braga, A.A., Welsh, B. C., et al., *Can Policing Disorder Reduce Crime? A Systematic Review and Meta-analysis*, Journal of Research in Crime and Delinquency, 52(4), 567–588 (2015), available at: https://doi.org/10.1177/0022427815576576.

[66] Campbell Collaboration is a social science research network that produces high quality, open access evidence synthesis in the field of criminology.

[67] No study was at least level 3 of the Maryland Scientific Methods Scale (SMS), i.e., a controlled design with both pretest and posttest measures and comparable control conditions.

[68] Van der Laan, P. H., Smit, M., et al., *Cross-border Trafficking in Human Beings: Prevention and Intervention Strategies for Reducing Sexual Exploitation*, Campbell Systematic Reviews (2011).

**Table 1. Maryland Scientific Methods Scale (SMS)[69]**

| Level | Study Design |
|-------|--------------|
| 1 | Correlation between a prevention program and a measure of crime at one point in time. |
| 2 | Measures of crime before and after the program, with no comparable control condition. |
| 3 | Measures of crime before and after the program in experimental and comparable control conditions. |
| 4 | Measures of crime before and after the program in multiple experimental and control units, controlling for other variables that influence crime. |
| 5 | Random assignment of program and control conditions to units. |

However, at present, I am not aware of even a single published Level 1 study evaluating the efficacy of the human trafficking victim identification protocols and/or "red flags" espoused by the Plaintiff and her named experts. Although, there is possibly some research underway that may be slated to "examine" and purportedly "validate" the Blue Campaign signs and indicators,[70] that research has not been published to date and was certainly not available at the time when the Plaintiff alleges that she was trafficked. Moreover, it is questionable whether this research will actually test the sensitivity and specificity[71] of these interventions using a rigorous methodology.

For example, I was invited by the Journal of Human Trafficking to serve as a peer-reviewer for the evaluation of a manuscript entitled *A Quasi-Experimental Intervention Trial to Test the Efficacy of a Human Trafficking Awareness Campaign: The Blue Campaign*, which was submitted and co-authored by researchers at Harvard and the Department of Homeland Security[72].

One of my initial critiques to this paper was regarding the "limitations and the serious flaws with the Blue Campaign," which include "the issues with the sensitivity and specificity (false positives and false negatives) associated with the Blue Campaign Indicators." In response to the critique, the authors, which as mentioned earlier included a "DHS scientist," responded by saying "we agree with the reviewer and have now pointed out this

---

[69] Farrington, D. P., Gottfredson, D. C. et al., *The Maryland Scientific Methods Scale: In Evidence-Based Crime Prevention*, pp. 27-35, Routledge (2003).

[70] U.S. Dep't of Homeland Security, *DHS Partners with Harvard University to Support Blue Campaign*, S&T Public Affairs (Mar. 12, 2021), available at: https://www.dhs.gov/science-and-technology/news/2021/03/12/news-release-dhs-partners-harvard-university-support-blue-campaign.

[71] Defined *Supra* Section II and Discussed *Infra* in the current section.

[72] Savoia, E., et al. "A Quasi-Experimental Intervention Trial to Test the Efficacy of a Human Trafficking Awareness Campaign: The Blue Campaign." Journal of Human Trafficking (2023): 1-20.

strong limitation in several parts of the discussion and specific section on 'limitations'[73]." Therefore, it is evident that even the developers of the Blue Campaign indicia, which are cited by the Plaintiff and/or her named experts, accept the fact that these indicia are presently unsupported by reliable empirical research.

Currently, instead of relying on state of the science research methods, businesses, service providers, and other practitioners are limited to implementing speculative "best practices" with relatively unknown efficacy. However, a growing number of qualitative and anecdotal data suggests that there are significant issues with misidentification, as discussed further below.

### *Sensitivity and Specificity*

Although the efficacy of available interventions for sex trafficking victim identification is relatively unknown, I can, to a reasonable degree of social scientific certainty, opine that many of the "red flags" being touted by the Plaintiff and her proposed experts have low rates of sensitivity and specificity.

Herein, the term sensitivity is defined as the ability of law enforcement, service providers, and other third parties to correctly identify true victims of human trafficking (true positive). The term specificity refers to the ability of law enforcement, service providers, and other third parties to correctly identify persons who are not victims of human trafficking (true negative).

In regard to sex trafficking victim identification, low sensitivity means that even if these protocols were implemented, victims of human trafficking would continue to be misidentified as non-victims, criminals, or co-conspirators. Low specificity means that even if these protocols were implemented, persons who are not victims of human trafficking would be misidentified as being possible victims.

These hypotheses are informed by my background, training, and expertise on the high rates of misidentification of victims by even trained professionals, including law enforcement. Moreover, there is a growing body of civil litigation regarding misidentification resulting from misguided "red flag" training on human trafficking.

### *Low Specificity*

A human trafficking "red flag" training with low specificity can be criticized as being too eager to find a positive result, even when it is not present. Implementing a human trafficking "red flag" training that has not been tested for sensitivity or specificity could result in false accusations/investigations of human trafficking against law abiding citizens.

---

[73] Journal of Human Trafficking. Manuscript Draft Submission: JHT-D-22-00077R1. Response to Reviewers.

Human Trafficking "Indicators" in Aviation

For example, the FAA Extension, Safety, and Security Act of 2016, requires air carriers to provide initial and annual flight attendant training regarding recognizing and responding to potential human trafficking victims. The Blue Lightning Initiative (BLI), led by the Department of Transportation, the Department of Homeland Security, and U.S. Customs and Border Protection, is an element of the DHS Blue Campaign. The BLI trains aviation industry personnel to identify potential traffickers and human trafficking victims, and to report their suspicions to federal law enforcement.

The BLI training was developed based on feedback from aviation industry "experts" and human trafficking survivors.  The training is 25 minutes in length, and is comprised of four lessons that include:

1. What is Human Trafficking?;
2. Indicators of Human Trafficking Activity;
3. Reporting Suspected Human Trafficking;
4. Indicator Challenge.[74]

One of the supposed "indicators" or "red flags" that airlines were trained on was "a non-genuine relationship; particularly parent/guardian-child (see Figure 2)[75]. However, there was absolutely no empirical evidence to support this "indicator" or "red flag" as being a valid sign of trafficking and anecdotal evidence suggests that it may have remarkably low rates of specificity.

According to multiple airline patrons, employees began falsely accusing and/or initiating investigations for trafficking against predominately mixed-race passengers, even though they were law abiding (for examples, see Table 2).



Figure 3. Blue Lightning Initiative for Aviation Personnel "Indicators"

Table 2. Examples of Human Trafficking "Red Flag" Indicia Resulting in False Allegations and Claims of Racial Profiling

| Case Name/Number | Year | Allegations |
|---|---|---|
| PETER DELVECCHIA, et al., Plaintiffs, v. FRONTIER | 2019 | Plaintiff Peter DelVecchia ("Peter") and his twelve-year old son, Plaintiff A.D., contracted with Defendant Frontier Airlines to fly from North Carolina to Las Vegas. Plaintiff Peter is Caucasian and his son, A.D. is African-American. Defendant Warren then falsely accused Peter of engaging in illegal human trafficking and sexual |

[74] U.S. Dep't of Transportation, *Blue Lightning Initiative*, available at: https://www.transportation.gov/administrations/office-policy/blue-lightning-initiative.

[75] Blue Lightning Initiative, *A Guide for Aviation Personnel to Recognize and Report Suspected Human Trafficking*, available at: http://hiddeninplanesight.org/wp-content/uploads/afa-cobranded-blue-lightning-pocket-guide-5.pdf.

| Case Name/Number | Year | Allegations |
|---|---|---|
| AIRLINES, Inc., et al., Defendants. Case No. 2:19-cv-01322-KJD-NJK | | assault. Based upon the allegations of the complaint, the assault and the accusations were based on Warren's belief that an older white man should not be traveling with a younger black child. Warren had discussed these beliefs with the rest of the flight crew, the other defendants. They concurred in his belief that the situation was "improper" and that Peter showed inappropriate affection to A.D. Warren then forced A.D. to leave his seat and father. He was forced to sit in the rear of the plane where an adult male sat between A.D. and the aisle. The father and the son were not allowed to reunite for the duration of the flight.[76] |
| N/A | 2021 | Mary MacCarthy of Los Angeles and her 10-year-old daughter, Moira, were flying to Denver. When they arrived in Denver, MacCarthy said, she and her daughter were met on the jetway by two Denver police officers. The mother and daughter were cleared, but police report noted that officers were responding to a "possible Human Trafficking reported by Southwest flight attendant," which Ms. MacCarthy believed was racial profiling.[77] |
| N/A | 2021 | Lakeyjanay Bailey, a 21-year-old Black woman, was traveling from Denver to Dallas with her 4-year-old adoptive sister, Olivia, who is white. When the pair landed at Dallas Fort Worth International Airport, authorities were waiting for them inside the gate. The incident report said that Frontier Airlines requested police to investigate the matter after a passenger on the plane was concerned about a possible human trafficking incident involving a female born in 2001 who was traveling with a female born in 2017[78]. |
| N/A | 2015 | Kathleen Chan and Jay Serrano, are residents of Astoria, Queens, who were returning from a holiday trip to the Dominican Republic. When their American Airlines flight landed at JFK Airport, the flight captain asked everyone to stay seated. After about 20 minutes, three-armed Port Authority police officers entered the plane and asked Chan to escort them outside. Chan, an Asian woman, and Serrano, a Puerto Rican man, were told that the flight crew had alerted the police that it was a possible case of sex trafficking[79], even though the couple were in a consenting adult relationship and actually lived together. |
| N/A | 2017 | Brian Smith, from Arizona, was travelling back from a trip to Florida with his wife Renee and their three children, including Georgianna, 16, who the couple adopted from China. Mr. Smith said as the family got off their Southwest Airlines flight in Phoenix, he was approached by police who said a flight attendant had "some concerns about the person you're with." Southwest Airlines later released a statement: "Our flight attendants do receive training in |

[76] *See* case information, available at: https://casetext.com/case/delvecchia-v-frontier-airlines-1.

[77] Jenn, S. & Lemos, G., *Mom says Southwest Airlines thought she was trafficking her biracial daughter*, CNN (Nov. 8, 2021), available at: https://www.cnn.com/2021/11/07/us/southwest-airlines-human-trafficking-accusation/index.html.

[78] Wang, B., *Black Aurora woman questioned for trafficking white sister at Dallas airport*, Denver7 (July 21, 2021), available at: https://www.thedenverchannel.com/news/local-news/black-aurora-woman-questioned-for-trafficking-white-sister-at-dallas-airport.

[79] Nolan Brown, E., *Another Asian Air Traveler Detained Over Suspicions She's Being Sex Trafficked*, Reason (Jan. 14, 2016), available at: https://reason.com/2016/01/14/another-asian-woman-detained-at-airport/.

| Case Name/Number | Year | Allegations |
|---|---|---|
|  |  | recognizing expert-identified, common behavioral indicators of human trafficking. Following conversations with authorities on the ground after the flight, we're continuing our conversation with the family and with our employees whose valuable vigilance is aimed at aiding law enforcement in successfully stopping a growing number of trafficking situations."[80] |
| N/A | 2017 | Osvaldo Maciel had been flying back to New York from a trip to Cancun to visit family with his fairer skinned young daughter on March 1, when another passenger accused him of child trafficking. When the plane touched down at Newark Airport, Mr. Maciel and his daughter were allegedly approached by a number of officers from the Port Authority and Customs and Border Patrol, escorted off the plane and interrogated. Mr. Maciel's wife stated the incident was based on nothing more than a racially charged observation.[81] |

Additionally, persons erroneously accused of trafficking and/or reported to the police as victims have started to file lawsuits alleging defamation. For example, Marcia Festen and E.L. recently filed a lawsuit against Eastside Medical Center LLC, Robin Lowman White, Elizabeth Davlantes, and Jane Marilyn Pineda on July 3, 2022 (Case No. 1:22-cv-02646-MHC) in the United States District Court Northern District of Georgia Atlanta Division asserting claims of defamation, slander and libel because E.L. was erroneously reported to the police as a suspected victim of trafficking.

Ultimately, although anti-trafficking training and interventions may be well-intentioned, they are largely untested or unsupported by rigorous empirical research. Extant information suggests that many "indicia" have low rates of specificity and misidentification persists.

<u>Human Trafficking "Indicators" in Hospitality</u>

Since its launch in 2010 by the Department of Homeland Security, Office of Partnership and Engagement (OPE), the Blue Campaign has been offering training to law enforcement agencies and others to increase detection and investigation of human trafficking, protect victims, and bring suspected traffickers to justice. However, even as of 2023, data scientists for DHS recognize that their training and educational materials are not based on empirical evidence and their reliability is unknown, if not questionable.

---

[80] News.com.au, *Man wrongly accused of human trafficking teenage daughter*, (Dec. 22, 2017), available at: https://www.news.com.au/travel/travel-updates/incidents/man-wrongly-accused-of-human-trafficking-teenage-daughter/news-story/0b541932de32ad24c66894fd86bc7ce4.

[81] News.com.au, *Father interrogated for child trafficking because his daughter did not look like him*, (Apr. 21, 2017), available at: https://www.news.com.au/travel/travel-updates/incidents/father-interrogated-for-child-trafficking-because-his-daughter-did-not-look-like-him/news-story/dad68db2c0d0a3425a80b04c545fa245.

Similar to the aviation industry, the Department of Homeland Security Blue Campaign later released a toolkit for identifying human trafficking in the hospitality industry in or about July or August of 2016[82] .

The Blue Campaign hospitality toolkit shared four sets of "indicators," which were still not empirically tested or validated[83], for different types of staff:

1. Hotel and Motel Staff;
2. Housekeeping, Maintenance, and Room Service Staff;
3. Concierge, Bellman, Front Desk, Security, and Valet Staff;
4. Food and Beverage Staff.

This toolkit includes a number of "general indicators," which lack any empirical support, for examples, see Table 3.

**Table 3. Sample of Blue Campaign "Indicia" and Countervailing Information**

| Applicable Staff | Blue Campaign "General Indicator" | Countervailing Information |
|---|---|---|
| All hotel and motel staff | Individuals have few or no personal items—such as no luggage or other bags. | There is no empirical evidence to support this purported "indicum." Publicly criticized for potentially ensnaring female travelers traveling alone, particularly for business[84]. This "indicum" is also largely inapplicable to exterior corridor hotels like the Defendant's property, where guests typically do not bring their luggage, if any, into the lobby for check-in but wait to unload closer to their assigned room. |
| Housekeeping, Maintenance, and Room Services | Refusal of cleaning services for multiple days. | There is no empirical evidence to support this purported "indicum." Particularly following the COVID pandemic, refusal of cleaning services is common and, for disease safety, many hotels did not/do not provide it without explicit request. |
| Housekeeping, Maintenance, and Room Services | Smell of bodily fluids and musk. | There is no empirical evidence to support this purported "indicum." Publicly criticized for potentially ensnaring sexual activity |

---

[82] U.S. Dep't of Homeland Security, *Human Trafficking and the Hospitality Industry* (Released on Aug. 10, 2016), available at: https://www.dhs.gov/blog/2016/08/10/human-trafficking-and-hospitality-industry. However, other sources state it was released in July of 2016.

[83] Dr. Mehlman-Orozco personally interviewed Mick McKeown, who was Executive Director of the Homeland Security Advisory Council and Campaign Office during the time this toolkit was created, and he confirmed absolutely no research was used in the development of these indicators or to test their sensitivity or specificity for identifying potential trafficking on premises.

[84] *See*, for example: Nolan Brown, E., *Are You a Woman Traveling Alone? Marriott Might Be Watching You*, Reason (2019), available at: https://reason.com/2019/02/05/hotel-surveillance-state-sex-trafficking/; Song, S., *When Anti-Sex Trafficking Policies like the Marriott's Do More Harm Than Good*, Paper Magazine (Jan. 30, 2019), available at: https://www.papermag.com/marriott-hotels-sex-trafficking-training-2627520121.html?rebelltitem=9#rebelltitem9.

| Applicable Staff | Blue Campaign "General Indicator" | Countervailing Information |
|---|---|---|
| | | between consenting adults and violations to rights to privacy[85]. |
| Housekeeping, Maintenance, and Room Services; as well as Concierge, Bellman, Front Desk, Security, and Valet Staff | The same person reserving multiple rooms. | There is no empirical evidence to support this purported "indicum." Larger families with more than four people, including my own, reserve multiple, adjacent rooms. |
| Housekeeping, Maintenance, and Room Services | Evidence of pornography. | There is no empirical evidence to support this purported "indicum." Publicly criticized for potentially ensnaring sexual activity between consenting adults and violations to rights to privacy[86]. |
| Housekeeping, Maintenance, and Room Services | Provocative clothing and shoes. | There is no empirical evidence to support this purported "indicum." Publicly criticized for policing adult female clothing choice and violations to rights to privacy[87]. |
| Housekeeping, Maintenance, and Room Services | Excessive amounts of sex paraphernalia in rooms (condoms, lubricant, lotion, etc.) | There is no empirical evidence to support this purported "indicum." Publicly criticized for potentially ensnaring sexual activity between consenting adults and violations to rights to privacy[88]. |
| Concierge, Bellman, Front Desk, Security, and Valet Staff | Room paid for with cash or pre-loaded credit card. | There is no empirical evidence to suggest that paying cash for a room is a reliable indicium of trafficking. Moreover, this is a common need for homeless populations, as well as for survivors of domestic violence and other persons in need of emergency and temporary housing. Claiming that "accepting cash" is an indication of human trafficking is not only unsupported by empirical research, but suggests an elitist, unreliable, and subjective perception of reality. Denying rooms to homeless populations, simply due to mode of payment, can have legal repercussions.[89] |
| Concierge, Bellman, Front Desk, Security, and Valet Staff | Individuals leaving room infrequently, not at all, or at odd hours. | There is no empirical evidence to support this purported "indicum." Moreover, it does |

---

[85] *See*, for example: Nolan Brown, E., *Are You a Woman Traveling Alone? Marriott Might Be Watching You*, Reason (2019), available at: https://reason.com/2019/02/05/hotel-surveillance-state-sex-trafficking/; Song, S., *When Anti-Sex Trafficking Policies like the Marriott's Do More Harm Than Good*, Paper Magazine (Jan. 30, 2019), available at: https://www.papermag.com/marriott-hotels-sex-trafficking-training-2627520121.html?rebelltitem=9#rebelltitem9.

[86] *Id*.

[87] *Id*.

[88] *Id*.

[89] In Ireland, a homeless family was awarded €22,000 in compensation after a hotel refused to honor their booking without a credit card. *See* Lucey, S., *Hotel discriminated against homeless family by demanding credit card*, Irish Legal News (Mar. 2, 2022), available at: https://www.irishlegal.com/articles/hotel-discriminated-against-homeless-family-by-demanding-credit-card.

| Applicable Staff | Blue Campaign "General Indicator" | Countervailing Information |
|---|---|---|
| | | not apply to the present claim, since the Plaintiff left the room frequently. |

Ultimately, given the lack of qualitative or quantitative evidence to support the efficacy of these "indicia" and interventions, they should be applied cautiously, if at all. While these "indicia" have not been adequately empirically tested, extant reliable principles and scientific methods suggest that implementation and training of these "indicia" will have no bearing on a business' ability to prevent, identify, or intervene against human trafficking on premises and may actually result in high rates of false accusations.  At present, any suggestion otherwise is based on unsupported speculation or subjective belief. Moreover, as discussed above, Blue Campaign did not even put these purported "indicia" into circulation until mid-2016.

# VI.   MISIDENTIFICATION OF HUMAN TRAFFICKING VICTIMS

Many experts agree that "the anti-trafficking field is a strikingly 'rigor-free zone' when it comes to defining the concept's legal parameters"[90]. It is believed that key aspects of the legal definition were intentionally left vague in order to achieve legislative consensus, but this has resulted in the indiscriminate conflation of legal concepts and misidentification of victims[91]. Even law enforcement and medical health providers are not consistently trained and, even when trained, misidentify victims of sex trafficking with frequency.

<u>Misidentification by Law Enforcement</u>

Given the lack of empirical evidence on human trafficking indicia and identification strategies, the likelihood of U.S. law enforcement officials actually identifying a victim has historically been relatively low, and even lower when it comes to private businesses.

For example, using a nationally representative survey of police organizations, Farrell, McDevitt, & Fahy (2010) found that between 2000 and 2006, less than 10% of police agencies identified a human trafficking case. Even with increases in awareness and new, more comprehensive legislation at the disposal of law enforcement, few human trafficking cases are ever identified (Farrell, Owens, & McDevitt, 2013).

In evaluating why many law enforcement agencies have identified relatively few cases, Farrell (2013) analyzed data from municipal police agencies in the United States. Her research found that despite changes in legislation, police agencies might still be unprepared to identify and respond to human trafficking locally. In part, the study found that due to theoretical and practical barriers with effectuating organizational change within police agencies, policy developments have not necessarily manifested into changes in practice.

As of 2014, The Polaris Project reported that only 32 states mandate or encourage training of law enforcement on human-trafficking crimes.[92] Even when the police have received basic training about human trafficking, they generally have been unable to identify a broad range of human trafficking.[93] Law-enforcement officials often struggle to distinguish

---

[90] Chuang, J. A., *Exploitation Creep and the Unmaking of Human Trafficking Law*, The American Journal of International Law, (108) 4: 609-649 (2014).

[91] *Ibid*.

[92] Polaris Project, *2014 State Ratings on Human Trafficking Laws* (2015), available at: https://polarisproject.org/wp-content/uploads/2019/09/2014-State-Ratings.pdf.

[93] Farrell, A. & Pfeffer., R., *Policing Human Trafficking: Cultural Blinders and Organizational Barriers*, The ANNALS of the American Academy of Political and Social Science (2014); Gallagher, A. & Holmes, P., *Developing an Effective Criminal Justice Response to Human Trafficking: Lessons from the Front Line*, International Criminal Justice Review (2008), available at: http://togetherletsstoptraffick.org/assets/OnlineDocuments/ICJR-GALLAGHER-HOLMES.pdf.; Wilson, J.M. & Dalton, E., *Human Trafficking in the Heartland: Variation in Law Enforcement Awareness and Response*, Journal of Contemporary Criminal Justice, pp. 296-313 (2008).

human-trafficking crimes from other previously existing crimes such as prostitution. As a result, law enforcement commonly misclassifies human-trafficking victims as offenders.[94]

To retroactively correct the erroneous criminalization faced by human trafficking victims in the criminal justice system, an increasing number of states have passed vacatur statues and safe harbor laws.[95] These laws provide post-conviction relief for survivors of human trafficking by completely erasing criminal convictions related to their victimization. By one count, 18 states had passed vacatur statutes and another 10 states had enacted partial vacatur laws by 2017.[96] By 2013, 18 states had passed safe harbor laws.[97]

Ultimately, misidentifications of trafficking victims by law enforcement were even more prevalent during the trafficking period alleged in this case. As such, there is no reliable basis to conclude that private businesses such as hotels should have been held to a higher standard or required to be better trained than law enforcement.

<u>Misidentification by Healthcare Providers</u>

Similar to law enforcement officers, the likelihood of medical and mental health providers successfully identifying a victim is also very low. Training on human trafficking for these professionals is also not evidence-based or universally mandated. For example, in *Psychiatry's Role in the Management of Human Trafficking Victims: An Integrated Care Approach,* which was published in 2018, the authors wrote that *"Victims are often underrecognized and there are few guidelines for how best to identify, care for, and safely reintegrate victims back into the community[98]."* Additionally, the authors found that there were no integrated care models that provide decisional guidelines at different points of intervention for human trafficking patients and that highlight the important role of psychiatric consultation. In another article, *What are the Human Trafficking Policies of Professional Medical Organizations?,* which was published in 2021, the authors wrote that "human trafficking is an international public health concern in which *healthcare professionals are in a unique position to intervene. It is unclear how professional medical*

---

[94] Farrell, A., Owens, C., & McDevitt, J., *New laws but few cases: understanding the challenges to the investigation and prosecution of human trafficking cases*, Crime, Law and Social Change, 661, 139-168 (2013); Farrell, A., Pfeffer, R., & Bright, K., *Police perceptions of human trafficking*, Journal of Crime and Justice, 38(3): 1-19 (2015).

[95] Mehlman-Orozco, K. B. & Hedlin, S., *Mehlman-Orozco, Hedlin: Stop criminalizing victims of sex trafficking*, The Houston Chronicle (Jan. 19, 2017), available at: https://www.houstonchronicle.com/opinion/outlook/article/Mehlman-Orozco-Hedlin-Stop-criminalizing-10869881.php.

[96] Rabjan, J., *State Advocacy, Fact Sheet: Vacatur Laws*, National Council of Jewish Woman, available at: https://www.ncjw.org/wp-content/uploads/2017/07/Fact-Sheet_Vacatur-Laws_Updated-2016.pdf.

[97] Mehlman-Orozco, K. B., *Safe Harbor legislation for juvenile victims of sex trafficking: A myopic view of improvements in practice*, Social Inclusion, Open Access Journal, 3. 1: 52-62 (2015).

[98] Gordon, Mollie, et al., *Psychiatry's Role in the Management of Human Trafficking Victims: An Integrated Care Approach*, Journal of Psychiatric Practice, 24.2 p. 79-86 (2018).

*organizations have responded to the need to identify and assist trafficked patients.*"[99] Even in 2021, only eight out of 265 national medical organizations had policies regarding human trafficking and "although *human trafficking is recognized as a public health issue, research on the health effects of human trafficking and best intervention practices is limited[100].*"

Failed opportunities for identification by medical and criminal justice professionals are a common experience by most victims of trafficking, especially considering that it is estimated that 88% of trafficking victims reported seeing an accredited healthcare professional during the time that they were trafficked[101].

While the "red flags" of trafficking that can be screened for in the medical fields are not empirically supported by rigorous and reliable research, they are beginning to be referred to as "best practices" and included in trainings and published guidance (for example, pelvic trauma, neglected care, and even "tattoos indicating ownership or sex work;" which include "names," "dollar signs," "references to money," and "tattoos on the neck or pelvis," among others).[102] Although, it should be clear, the medical and mental health communities have largely not yet adopted and/or generally accepted these indicia for identifying victims of trafficking and the "human trafficking" phenomenon was relatively recently introduced to the medical and mental health fields. At present, I am not aware of any empirically validated, medical "red flags" that were detected during the period that the Plaintiff alleges she was trafficked at Defendant's property, nor would a "red flag" for the medical or mental health setting be appropriate to assess in a business setting.

Ultimately, like most service providers, private businesses, and members of the public, health care providers often have misconceptions and stereotypes about what trafficking looks like and these pre-judgements can impede identification. Moreover, despite being completely ignored by the Plaintiff and her named experts, it is general accepted within the field that there is extreme "difficulty understanding the difference between commercial sex and sex trafficking[103]."

<u>Available Protocols for Identification</u>

While empirical evidence on "risk factors" and "indicia" of trafficking specific to the hotel industry is questionable and still in development, there some protocols available regarding human trafficking identification in general. For example, one of the first protocols for

---

[99] Fang, S., et al., *What are the Human Trafficking Policies of Professional Medical Organizations?*, Journal of Human Trafficking (2021), available at:
https://www.tandfonline.com/doi/abs/10.1080/23322705.2019.1698895.

[100] Jain, J., et al., *Creating a collaborative trauma-informed interdisciplinary citywide victim services model focused on health care for survivors of human trafficking*, Public Health Reports 137.1_suppl: 30S-37S (2022).

[101] Gordon, Mollie, *Human Trafficking: In Plain Sight – Health Care Response to Trafficking: Recognize, Respond & Refer*, available at: https://www.youtube.com/watch?v=nJxtfN9siLY.

[102] Fang, S., et al., *Tattoo recognition in screening for victims of human trafficking*, The Journal of Nervous and Mental Disease, 206.10: 824-827 (2018). Note: none of these are sufficiently alleged in the present complaint.

[103] *Id*. at 55.

methodically screening and identifying human trafficking was published in 2009 by the International Labour Office. The protocol was developed from a Delphi methodology, which involved two successive electronic surveys of human trafficking experts: a first survey in April 2008 to collect indicators from the expert group; and a second one in July 2008 to establish a rating of the indicators. Experts were selected from the 27 EU Member States from police, government, academic and research institutes, NGOs, international organizations, labor inspectorates, trade unions and judiciaries.

Findings from the survey suggested there are six "dimensions" of trafficking indicators: (1) deceptive recruitment, (2) coercive recruitment, (3) recruitment by abuse of vulnerability, (4) exploitive conditions of work, (4) coercion at destination, and (5) abuse of vulnerability at destination. The indicia for each dimension were ranked "strong," "medium," or "weak" for each type of trafficking: (1) trafficking of adults for labor, (2) trafficking of adults for sex, (3) trafficking of children for labor, and (4) trafficking of children for sex.

Each of the six dimensions of trafficking were assessed independently from the others and the result of the assessment was positive if the dimension included at least: (1) Two strong indicators, or (2) One strong indicator and one medium or weak indicator, or (3) Three medium indicators, or (4) Two medium indicators and one weak indicator.

After an assessment was done for each dimension, the final analysis involved combining the six elements to identify potential victims of trafficking—in the case of adults, the presence of deception, coercion, abuse and exploitation and in the case of children simply the presence of exploitation.

A full scale test of these indicators took place in Moldova in the second half of 2008, using a sample of migrants. The final analysis of the dataset gave the ratio of migrants to victims of deceptive or coercive recruitment, exploitation, and coercion at destination. Based on the results, migrants were qualified as successful migrants (no deception, no exploitation, no coercion), exploited migrants (exploitation without deception or coercion), victims of deception and exploitation (without coercion) and victims of trafficking for forced labor (deception, exploitation, and coercion).

A full list of the International Labour Organization's Operational Indicators of Commercial Sexual Exploitation of Children is included in Appendix D. A summary of "Strong Indicators," across all trafficking types, are listed below:

- *Deceptive recruitment:* being deceived about the nature of the job, location, or employer, or deceived about access to education opportunities.
- *Coercive recruitment:* violence, abduction, forced marriage, forced adoption or selling of the victim, debt bondage, or threats of violence.
- *Abuse of vulnerability:* no identified strong indicators.
- *Exploitation:* excessive working days, excessive working hours, or hazardous work.
- *Coercion at destination:* confiscation of documents, debt bondage, forced into illicit/criminal activities, forced tasks or clients, isolation, confinement,

surveillance, threats of violence against victim, or violence against victim.
- *Abuse of vulnerability at destination:* dependency on exploiters.

Ultimately, given the dearth of empirical research on human trafficking "red flags" and indicia, it is important to consider the totality of the circumstances, as well as available qualitative research and evidence when making a determination of human trafficking. In contrast, it is inappropriate to ignore certain pieces of evidence and rely instead on abstract presumptions or unsupported generic allegations. However, the Plaintiff's testimony concerning alleged trafficking at the Defendant's property, even if accepted as true and countervailing evidence is rejected as false or unreliable, do not sufficiently reveal "strong indicia" of sex trafficking under the ILO Operational Indicators that would have been readily apparent to the Defendant and actionable (for example see Table 4).

**Table 4. Strong Trafficking Indicators from the ILO Delphi Survey Compared to Present Matter**

| Strong Trafficking Indicators | Application to Present Matter |
|---|---|
| Deception about the nature of the job | Not sufficiently alleged and no reliable evidence to suggest that the Defendant's staff were made aware of this potential indicator. |
| Deception on the location of the job | Not alleged. |
| Deception about employer | Not alleged. |
| Deception about access to education opportunities | Not alleged. |
| Acts of Violence | Not sufficiently alleged and no reliable evidence to suggest that the Defendant's staff were made aware of this potential indicator. |
| Abduction | Not alleged. |
| Forced Marriage | Not alleged. |
| Forced Adoption | Not alleged. |
| Selling of the Victim | Not sufficiently alleged and no reliable evidence to suggest that the Defendant's staff were made aware of this potential indicator. |
| Debt Bondage | Not alleged. |
| Explicit Threats of Violence | Not sufficiently alleged and no reliable evidence to suggest that the Defendant's staff were made aware of this potential indicator. |
| Excessive Working Days | Not alleged. |
| Excessive Working Hours | Not alleged. |
| Hazardous Work | Not sufficiently alleged and no reliable evidence to suggest that the Defendant's staff were made aware of this potential indicator. |
| Confiscation of Documents | Not alleged. |
| Forced Criminal Activities | Not sufficiently alleged and no reliable evidence to suggest that the Defendant's staff were made aware of this potential indicator. |
| Forced Tasks or Clients | Not sufficiently alleged and no reliable evidence to suggest that the Defendant's staff were made aware of this potential indicator. |
| Isolation | Not sufficiently alleged and no reliable evidence to suggest that the Defendant's staff were made aware of this potential indicator. |
| Confinement | Not sufficiently alleged and no reliable evidence to suggest that  the Defendant's staff were made aware of this potential indicator. |
| Surveillance | Not sufficiently alleged and no reliable evidence to suggest that the Defendant's staff were made aware of this potential indicator. |
| Dependency on Exploiters | Not sufficiently alleged and no reliable evidence to suggest that the Defendant's staff were made aware of this potential indicator. |

# VII.  SEX TRAFFICKING

## *Sex Trafficker Characteristics*

Earlier research on recruitment and control in the commercial sex industry explored tactics used by "pimps" as opposed to "sex traffickers." Pimps recruited women into the commercial sex industry through one or a combination of five techniques: (1) love (romantic relationships), (2) debt (through extravagant introductory gifting), (3) drugs, (4) the "gorilla" technique (brute force), and (5) position of authority (parents or family).[104]

Similarly, sex traffickers in the United States conceal their exploitive intentions through entrapment and enmeshment schemes, portraying themselves as boyfriends/lovers or faux family, as well as using ruses involving debt bondage or coerced co-offending to gain compliance, while diminishing human trafficking victim credibility, likelihood of escape, and cooperation with law enforcement.

In conducting my own interviews with convicted human traffickers, I found that sex traffickers typically projected themselves to be honest heroes and lovers, while concealing their true self-identity as skilled manipulators.[105] Each human trafficker I interviewed claimed to truly love his victims and believed his/her actions helped improve their victims' lives, despite being convicted for sex trafficking.

In addition, the sex traffickers I interviewed rationalized their crimes through a common understanding of the commercial sex industry counterculture—also known as "The Game" or "The Life"—which was perceived as being misunderstood by mainstream conformists.

## *Human Trafficking Victim Characteristics*

Law enforcement and direct service providers regularly encounter victims of human trafficking who do not view themselves as victims and in many cases decline assistance. Many victims can be led to believe that they are "in love" with their trafficker or were "rescued" by their trafficker and feel compelled to return, even after being liberated by law enforcement[106]. The emotional and social attachment described by victims is explained as "trauma bonding" by experts in the field.

Trauma bonding is generally defined as the complex emotional relationship that often exists between human traffickers and their victims. In order to facilitate a trauma bond with a victim, human traffickers will use a combination of emotional manipulation, feigned affection, physical and emotional abuse, common goals, and other tactics in order to maintain control and obedience for sexual exploitation. Their attachment with the

---

[104] Mehlman-Orozco, K., *Projected Heroes and Self-Perceived Manipulators: Understanding the Duplicitous Identities of Human Traffickers*, Trends in Organized Crime, 23(2), pp. 95-114 (2017).

[105] *Ibid.*

[106] *Ibid.*

perpetrator of the trauma/trafficker can serve as a coping mechanism for victims, while leading to distrust of law enforcement, family, and others, as well as failure to report victimization or delayed reporting, omissions, errors, and discrepant accounts.

While these counterintuitive reactions are described as byproducts of trauma bonding, they are also partially explained by the restricted life-choices of victims, prior to and following their commercial sexual exploitation. These victims are typically raised in dysfunctional environments, being in-and-out of various parts of the social services system including private NGOs, foster homes, and runaway shelters. Even after they are rescued from the commercial sex industry, there are limited resources to assist victims of human trafficking with housing, vocational placement, or education. Given the limited or non-existent resources for victims, human traffickers often portray themselves as "honest heroes," who rescued America's "disposable people."

The dysfunctional attachment between victims and human traffickers can hinder identification and impede prosecution by reducing the likelihood of cooperation with law enforcement; thus, perpetuating the exploitation. Eventually, victims of sex trafficking can have their agency obscured to such a degree that they can perceive themselves as consenting prostitutes who may facilitate the exploitation of others, despite the fact that they are being exploited.

### *Affected Industries*

In 2018, two years after the alleged trafficking period in the present case, the anti-trafficking non-profit Polaris Project released a report entitled *On-Ramps, Intersections, and Exit Routes: A Roadmap for Systems and Industries to Prevent and Disrupt Human Trafficking,* which included a section on recommendations for *Hotels and Motels*.[107] The survey included only 127 respondents and was not regulated by any institutional review board (IRB) process, which is standard practice for empirical research. While a nationwide sample of 127 respondents is too small to draw any generalizable inferences and the methodology was limited[108], resulting in empirically unreliable data, some named experts rely upon the findings of this study when discussing industries affected by sex trafficking.

---

[107] Available at: https://polarisproject.org/wp-content/uploads/2018/08/A-Roadmap-for-Systems-and-Industries-to-Prevent-and-Disrupt-Human-Trafficking.pdf.

[108] For example, the survey was completed online and respondents were not asked for any kind of confirmation of victim status. Respondents were not selected randomly and were compensated for their participation. Results did not account for social desirability bias, nonresponse bias, or sampling bias.

The report identified eight industries that encounter human trafficking crimes:

1. Financial Services;
2. Housing and Homelessness Systems;
3. Social Media;
4. Temporary Work Visas;
5. Transportation;
6. Business Regulatory Systems;
7. Healthcare; and
8. Hotels and Motels.

Of those different industries, Hotels & Motels encountered the fewest forms of trafficking (see Figure 4), and other industries were alleged to "facilitate" these crimes more.

Ultimately, the reality is that human trafficking is a clandestine crime. Traffickers go to great lengths to conceal their activities from third parties. Therefore, even though a variety of industries may encounter trafficking victims on their platforms or premises, more often than not these encounters are obscured.

| | Financial Services Industry | Hotels & Motels | Housing & Homelessness Systems | Social Media | Temporary Work Visas | Transportation | Business Regulatory Systems | Health Care |
|---|---|---|---|---|---|---|---|---|
| Escort Services | ● | ● | ● | ● | | ● | | ● |
| Illicit Massage Businesses | ● | | ● | ● | ● | | ● | ● |
| Outdoor Solicitation | ● | ● | ● | ● | | | ● | ● |
| Residential Sex Trafficking | ● | | ● | | | ● | | |
| Domestic Work | ● | | ● | ● | ● | ● | | ● |
| Bars, Strip Clubs, & Cantinas | ● | | | ● | | ● | ● | ● |
| Pornography | ● | | | ● | | ● | ● | |
| Traveling Sales Crews | ● | ● | ● | | | ● | | ● |
| Restaurants & Food Service | ● | | ● | | ● | ● | ● | ● |
| Peddling & Begging | | | ● | | | | | |
| Agriculture & Animal Husbandry | ● | | ● | | ● | ● | | ● |
| Personal Sexual Servitude | | | | ● | | | | ● |
| Health & Beauty Services | ● | | | | ● | | ● | ● |
| Construction | ● | | | | ● | | ● | ● |
| Hospitality | ● | ● | | | ● | | ● | ● |
| Landscaping | ● | | | | ● | ● | ● | ● |
| Illicit Activities | ● | | | | ● | | ● | |
| Arts, Sports & Entertainment | ● | | | ● | ● | | ● | |
| Commercial Cleaning Services | ● | ● | ● | | ● | | ● | |
| Factories & Manufacturing | ● | | ● | | ● | | ● | |
| Remote Interactive Sexual Acts | ● | | ● | ● | | | ● | |
| Carnivals | ● | | | | ● | ● | ● | ● |
| Forestry & Logging | ● | | | | ● | ● | ● | ● |
| Health Care | ● | | ● | | | | ● | ● |
| Recreational Facilities | ● | | ● | | | | ● | |

**Figure 4. Polaris Project Matrix on Human Trafficking Types by Industry**

# VIII.  ACTUAL OR CONSTRUCTIVE KNOWLEDGE

In general, alleged victims of sex trafficking involving third parties may assert that there were subtle "red flags" that should have been noticed. For example, in the hotel industry, plaintiffs and purported experts may contend that asking for extra towels, turning down room service, or having multiple cell phones, "excessive" condoms, lingerie, and gift cards in the room are "red flags" of trafficking that hotel staff should have noticed and acted upon these purported indicia. I am not aware of any empirical evidence to support the reliability of these "red flags" and anecdotal data suggests these that these supposed "red flags" have low rates of sensitivity and specificity[109] in a business setting. Moreover, even if these purported "red flags" were reported by employees to law enforcement, most of them are not illegal and are therefore unactionable. As such, even if accepted as true that these purported "red flags" were evident in a particular case, they do not rise to the level of establishing a private business knew or should have known that an individual was being sex trafficked.



Figure 5. Blue Lightning Initiative for Aviation Personnel "Indicators"

Moreover, although most sex workers are not victims of trafficking,[110] many civil claims involving third parties allege that businesses should treat purported indicia of sex work as indicia of sex trafficking; thus, asking private citizen employees to assume all suspected sex workers are potentially trafficked victims.  In a private business setting, relying on the stereotype of what an average citizen thinks a sex worker might look like is not supported by empirical research and may expose the business to allegations of civil rights violations and/or defamation.

---

[109] Low sensitivity herein means that victims of human trafficking are often misidentified as non-victims, criminals, or co-conspirators. Low specificity herein means that persons who are not victims of human trafficking are often misidentified as being victims.

[110] Due to the clandestine nature of the crimes, reliable prevalence estimates are difficult to come by for both sex trafficking and consenting adult sex workers. However, available estimates suggest there are between one million to two million sex workers in the United States, while there are only estimated to be 15,000 to 300,000 victims of sex trafficking. Even if the highest estimates are assumed to be true, this suggests that less than 30% of sex workers are victims of trafficking, but potentially less than 1%. Small sample studies of sex worker populations support the reality that most sex workers are not trafficked. For example, according to Conflict and Agency Among Sex Workers and Pimps: A Closer Look at Minor Domestic Sex Trafficking (2016), pimps were responsible for initiating into sex work 16 percent of the females, 1 percent of the males, and none of those who were transgendered. At 8.1 percent overall, pimp initiation was far less common than peer initiation by a friend (47 percent) or customer initiation (23 percent). In Atlantic City where the researchers interviewed sex workers who were 16 to 24 years old, they found that those who first entered when over 18 years of age reported being approached by a pimp at nearly twice the rate of those whose entry occurred when they were minors, and "self- initiation" was roughly twice as common among minors as those who entered after 18 years of age.

For instance, as previously mentioned, one of the supposed "indicators" or "red flags" that private businesses in the aviation industry were trained on was "a non-genuine relationship; particularly parent/guardian-child" (see Figure 5)[111]. However, there was absolutely no empirical evidence to support this "indicator" or "red flag" as being a valid indica of trafficking and anecdotal evidence suggests that it may have remarkably low rates of specificity. According to multiple airline patrons, employees began falsely accusing and/or initiating investigations for trafficking against predominately mixed-race passengers, even though they were law abiding (for example, see PETER DELVECCHIA, et al., Plaintiffs, v. FRONTIER AIRLINES, Inc., et al., Defendants. Case No. 2:19-cv-01322-KJD-NJK (N.D. Ga.).

---

[111] Blue Lightning Initiative, *A Guide for Aviation Personnel to Recognize and Report Suspected Human Trafficking*, Hidden in Plane Sight, available at: http://hiddeninplanesight.org/wp-content/uploads/afa-cobranded-blue-lightning-pocket-guide-5.pdf.

## IX.   CASE ALLEGATIONS

In this matter, AG and GW sought out Zaccheus "PD" Obie and Quintavious "Swayzii" Obie, known pimps who they were acquainted with through a friend, in order to gain employment in a strip club. Thereafter, both AG and GW were trafficked for approximately a month (on or about June 2017 to on or about July 2017). During this time, AG and GW met commercial sex consumers on public streets, at gas stations, and in hotel parking lots. Additionally, the Plaintiff's traffickers:

1.  Arranged to have AG and GW transported from Commerce, Georgia to Atlanta motels[112] for "prostitution";
2.  Took all of the money AG and GW earned;
3.  Taught AG and GW about "the game" and how to walk "the track" or "the blade"[113];
4.  Set "the rules" for AG and GW, which included no smoking, no drinking, no drugs, no getting into a commercial sex consumer's car, and to collect the money first;
5.  Set quotas ($500 per night) for AG and GW; and
6.  Drove AG and GW to different hotels[114] and paid for the rooms. [115]

The United Inn and Suites was not aware of any of this information, due to the clandestine nature of the victimization. There were also no incidents involving AG or GW contemporaneously and neither AG or GW reported their victimization to United Inn and Suites[116]. However, despite the failed overt disclosure of their victimization, both AG and GW elected to file lawsuits against he Defendant in the present matter.

In her complaint, the Plaintiff alleges that she was trafficked at the United Inn & Suites hotel located at 4649 Memorial Drive, Decatur, Georgia 30032 (the "United Inn") when she was a minor and proffers that her trafficker entered a guilty plea in the United States District Court for the Northern District of Georgia for sex trafficking A.G. and G.W. on November 6, 2020[117]. While the Plaintiff also alleges in the complaint that the Defendant "knew or should have known" that she was being sex trafficked, much of the information provided by the Plaintiff and her named experts in support of this claim is contradicted by subsequent testimony, evidence, research, and additional countervailing data, which are discussed in the sections below.

For example, the Plaintiff's presentation of her alleged "basic premise" is predominately supported by unsupported speculation or subjective belief (see Table 5 for overview).

---

[112] Plural. Indicating the Defendant's property was not singled out or sought after.
[113] Area where sex is sold on the streets.
[114] Again, plural, which indicates that the Defendant's property was not singled out or sought after.
[115] According to Defendant Zaccheus "PD" Obie's Sentencing Memorandum.
[116] See, summary in Karim Vellani Reports for GW and AG, Page 16.
[117] See Complaint Page 5, Paragraph 8.

**Table 5. Sample of Plaintiff's "Basic Premise" and Overview of Countervailing Information**

| Examples of Plaintiff's Complaint Statements | Overview of Countervailing Information |
|---|---|
| "Sex trafficking is a well-documented and pervasive problem in hotels and motels."[118] | The prevalence of sex trafficking cases is not "well-documented;" in fact, it is currently unknown. As discussed in the *Supra* sections, the "knowledge" about trafficking and how to appropriately intervene is still in development. A further timeline on the evolution of knowledge is illustrated in *Supra* Figure 1. At present, there is no methodologically rigorous estimate for the number of trafficking cases at hotels and motels. While some anti-trafficking organizations publish loose estimates, these are not deemed reliable or generalizable by any empirical authority. For example, the Polaris website states "Hotels and motels are **a common venue** for sex trafficking," not "the most common venue[119]." However, even Polaris acknowledges that these hotels are typically "unwitting[120]" when and if trafficking is encountered. |
| "During the period at issue, Northbrook knew or should have known common signs of sex trafficking as well as policies to prevent, identify, and deter sex trafficking at the United Inn[121]…. Northbrook acted negligently, willfully, wantonly, and callously by not having policies or procedures in place at the United Inn to combat the well-known danger of sex trafficking in the hospitality industry, by failing to train its managers, employees, and agents at the United Inn on the pervasiveness of sex trafficking in the hospitality industry and to be on the lookout for well-known signs of sex trafficking, by failing to take any measures at the United Inn to prevent sex trafficking at the hotel, by allowing rooms at the United Inn to be rented to traffickers and pimps on a repeated and ongoing basis for open and obvious sexual exploitation of Plaintiff and other minors for days and weeks, and by failing to otherwise protect and/or warn invitees about dangerous and hazardous conditions at the United Inn about | During the period at issue (June to July 2017), there were no known evidence-based signs of sex trafficking or policies to reliably "prevent, identify, and deter" sex trafficking in the hospitality industry. As discussed in the sections above, there are no extant evidence based trainings on trafficking for hoteliers, much less during the alleged trafficking period in this case. Regardless of whether a business has adopted a companywide anti-trafficking policy, there is no evidence to suggest that would have any impact on the prevention of trafficking or identification of victims or offenders. Moreover, as discussed above, law enforcement in many states does not have agency-wide mandated training; as such, it is unreasonable to hold a private business to a higher standard than law enforcement. For example, in 2017, while training on trafficking was mandated for law enforcement in Georgia, the training did *not* specifically address the commercial sexual exploitation of children.[123] More importantly, persons trained on trafficking, including law enforcement, are still likely to misidentify cases and as a result there is no known statistically significant difference in the ability to identify trafficking cases between trained and untrained hoteliers. |

---

[118] See Complaint Page 6, Paragraph 11.

[119] For example, see: National Human Trafficking Hotline. n.d. Hotel/Motel-Based. Polaris Project. Available at: https://humantraffickinghotline.org/en/sex-trafficking-venuesindustries/hotelmotel-based

[120] Polaris. January 16, 2019. Hotel Companies Step Up to Fight Human Trafficking. Available at: https://polarisproject.org/blog/2019/01/hotel-companies-step-up-to-fight-human-trafficking/

[121] See Complaint Page 6, Paragraph 11.

[123] See, for example, Shared Hope. 2017. National State Law Survey: Law Enforcement Officer Training on Human Trafficking. Retrieved from: http://sharedhope.org/wp-content/uploads/2016/03/NSL_Survey_Law-Enforcement-Officer-Human-Trafficking-Training.pdf

| Examples of Plaintiff's Complaint Statements | Overview of Countervailing Information |
|---|---|
| which Northbrook had actual and/or constructive knowledge."[122] | |

Ultimately, despite alleging in the complaint that sex trafficking and other crimes were frequent and foreseeable at the United Inn, there are no reliable data to support these claims. While the Plaintiff attempts to lean on the opinions from her named experts, the basis for their respective opinions is also questionable at best. A summary of the limitations to the opinions proffered by the Plaintiff's named experts are discussed further in the *Infra* section.

# X.    PROPOSED PLAINTIFF EXPERTS

In addition to the claims made by the Plaintiff in her Complaint, the Plaintiff's named expert witnesses similarly rely more upon unsupported speculation or subjective belief rather than scientific methods or reliable principals. Specifically, conclusions by the Plaintiff's named experts are remarkably limited by being founded upon:

1. Improper legal conclusions;
2. Misunderstanding;
3. Unreliable and/or miscited evidence;
4. Conflation; and
5. Ignored context, credibility gaps, and countervailing testimony/evidence.

The two named expert witnesses for the Plaintiff—Naeshia McDowell and Darrell Chaneyfield—fail to cite to any reliable research assessing the prevalence of sex trafficking on hotel premises. They also could not cite to any empirical research assessing the reliability and/or validity of sex trafficking interventions or indicia in the hospitality industry. Both named experts repeatedly ignored the limitations of human trafficking identification, as well as the barriers to rigorous research on the efficacy of interventions. Neither of the Plaintiff's named experts acknowledged the sensitivity and specificity challenges with victim identification, but instead repeatedly conflated prostitution and/or drug use indicia with sex trafficking. Additionally, hindsight and confirmation bias appears to have considerably impacted the Plaintiff's experts' interpretation and application of the facts in evidence.

Examples of these issues are discussed further in the sections below.

---

[122] See Complaint Page 8, Paragraph 15.

**Naeshia McDowell, MPH**

*Qualifications*

Ms. McDowell begins her report by providing a one paragraph summary of her educational background and training, which contained little to no focus on trafficking. Specifically, Ms. McDowell received a bachelor degree in Biology with a minor in Chemistry from Georgia State University, and a M.P.H. with a concentration in Epidemiology from the Georgia State University School of Public Health. These areas of education are related to the medical field, not human trafficking.

Ms. McDowell notes that she completed advanced coursework in Applied Biostatistics, Epidemiology in Public Health, Social and Behavioral Foundations of Public Health and A Systems Approach to Health Care in America. Despite Ms. McDowell's claims that these courses "informed" her knowledge of the commercial sexual exploitation of children, sex trafficking, and trauma; it is unclear how or in what capacity. Moreover, I was not provided with a curriculum vitae or resume to supplement this limited summary.

While Ms. McDowell may not qualify as an expert by virtue of her educational background, her limited exposure to trafficking-related content appears to be via her general work experience, namely:

1. January 2022 to Present (1 year 7 months): Director of the Commercial Sexual Exploitation of Children (CSEC) Response Team, a program of the Children's Advocacy Centers of Georgia (CACGA);
2. October 2020 to January 2022: (1 year 4 months): Statewide Child and Youth Care Coordinator of the CSEC Response Team;
3. June 2017 to October 2020 (3 years 5 months) Prevent Child Abuse Georgia as the Training and Helpline Program Coordinator; and
4. January 2017 to August 2017: Georgia Bureau of Investigation as a Sudden Death in the Young Specialist.

It is worth noting that while Ms. McDowell's experience as a Director has only been for the last year and a half, this summary took up the bulk of the text under her report section on professional experience (pages 3-4). Moreover, the activities described regarding her role are more consistent with a service provider, as opposed to an expert who is capable of opining on reliable principals and scientific methods.

For example, on page 6 of her report Ms. McDowell boasts that she is a "credentialed training facilitator for Ending the Game," which she describes is "an evidence informed, psychoeducational human trafficking intervention curricula which educates trafficking victims of psychological coercion and various aspects of trafficking, including recruitment, entrapment, and enmeshment, with the goal of preventing recidivism." In support of her statement, Ms. McDowell cites to an article entitled *Ending the Game: A new psychoeducational curriculum for victims of commercial sexual exploitation,* published in 2022[124]. Ms. McDowell neglects to mention this article acknowledges the

---

[124] Maria Usacheva, Carrie Smalley, Nancy Hafer & Susan Brooks (2022) Ending

program and assessment was a pilot and the study suffered from "multiple methodological deficits[125]."

Last, it appears as though Ms. McDowell does not have a single peer-reviewed publication on trafficking.

### Opinions

Despite having limited experience on human trafficking, which is concentrated within the last few years, Ms. McDowell levels two opinions in her report:

1. "Opinion 1: Sex traffickers manipulate, control, and coerce minor victims through recruitment, entrapment, and enmeshment. As a result of recruitment, entrapment, and enmeshment, minor victims rarely flee exploitative relationships."
2. "Opinion 2: Based on my review of the discovery, and my conversations with AG, GW, and JG, I conclude that AG, GW, and JG's respective traffickers manipulated, controlled, and coerced them through recruitment, entrapment, and enmeshment. It is more likely than not that AG, GW, and JG did not flee the exploitative relationships with their traffickers based on recruitment, entrapment, and enmeshment."

Regarding Ms. McDowell's first opinion, it is nonsensical as written. She states that sex traffickers manipulate, control, and coerce minor victims through recruitment, entrapment, and enmeshment. Perhaps what she is trying to convey is that sex traffickers utilize entrapment and enmeshment schemes to recruit, manipulate, control, and coerce minor victims. If the latter is what she was attempting to opine, I think all parties would stipulate to that fact. As discussed in the *Supra* sections, the entrapment and enmeshment schemes utilized by traffickers are primarily the reason why trafficking crimes are so clandestine and difficult to identify by third parties, including trained law enforcement. As such, it is truly a moot point to debate or discuss the content in Ms. McDowell's following section (pages 7-13). Instead, I will simply proffer that a superior method for conceptualizing methods of trafficker recruitment is as follows.

---

the Game®: A New Psychoeducational Curriculum for Victims of Commercial Sexual Exploitation, Women & Criminal Justice, 32:3, 257-276, DOI: 10.1080/08974454.2021.1885568. Retrieved from: https://www.researchgate.net/profile/Maria-Usacheva-2/publication/349814656_Ending_the_Game_R_A_New_Psychoeducational_Curriculum_for_Victims_of_Commercial_Sexual_Exploitation/links/62911b8e8d19206823dfdd26/Ending-the-Game-R-A-New-Psychoeducational-Curriculum-for-Victims-of-Commercial-Sexual-Exploitation.pdf

[125] See page 261.

Despite the dearth of empirical data, trafficking risk and targeting can be best conceptualized through the established theory related to Maslow's hierarchy of needs, as discussed in my book, *Hidden in Plain Sight: America's Slaves of the New Millennium*, (for reference, see Figure 6). Essentially, an individual at-risk of being trafficked, more often than not, has a void. In order to manipulate the victim, a trafficker typically makes a false promise that will ostensibly fulfill the respective void. As such, the determination of whether a trafficker coerced, defrauded, and/or exploited a particular victim is highly individualized by both victim risk and trafficker recruitment and control methods. The individualized nature of trafficker recruitment and control methods is one of the many reasons why this clandestine crime is so difficult to prevent and detect, as well as to develop reliable intervention strategies to combat this pernicious crime.



**Figure 6. Maslow's Hierarchy of Needs**

Next, Ms. McDowell claims that due to the entrapment and enmeshment schemes utilized by traffickers, "minor victims rarely flee exploitative relationships." While I am not aware of any reliable empirical data that suggests that minor victims "***rarely*** flee exploitative relationships", I will agree that escape, identification, detection, and intervention is certainly inhibited by the recruitment and control tactics utilized by traffickers.

Last, Ms. McDowell attempts to apply her nonsensical Opinion 1 to the discovery of the present matter and her "conversations[126]" with the Plaintiff, as discussed in the section following Opinion 2. Additionally, Ms. McDowell claims that using the Commercial Sexual Exploitation Identification Tool (CSE-IT), she was able to ***conclude*** that "A.G. and G.W. were recruited, entrapped, and enmeshed by Obie and Anderson, and it is more likely than not they did not flee the exploitative relationships with their traffickers because of recruitment, entrapment, and enmeshment." It is unclear how Ms. McDowell was able to level this dispositive conclusion when the possible score outcomes of this particular tool are as follows:

1. 0-3: No Concern
2. 4-8: Possible Concern
3. 9-23: Clear Concern[127].

---

[126] It is unclear what qualitative interviewing strategies Ms. McDowell used; however, from the information proffered these "conversations" may not have been trauma informed or unbiased.
[127] For examples, see Romero, Devon E., et al. "A review of child sex trafficking instruments." *Journal of child and adolescent counseling* 7.1 (2021): 56-69 and Basson, Danna. "Validation of the commercial

This tool was not developed to make a determinative finding of fact, so it is unclear why Ms. McDowell is attempting to use it as such. Moreover, the CSE-IT pilot study acknowledge that this tool imposes "the broadest definition" of commercial sex exploitation as the exchange of "a sex act or sexually explicit imagery for money or non-monetary goods" whether or not it was induced[128], which is inconsistent with how to distinguish CSEC versus commercialized vice in criminal adjudication[129].

Ultimately, Ms. McDowell's legal conclusions predominately appear to be based on unsupported speculation and subjective belief, as opposed to reliable principals and scientific methods. She attempts to thinly veil this fact with a misuse of a broad tool that is meant to screen for risk, not to level diagnostic or determinative conclusions and/or usurp the role of the trier of fact.

## Darrell Chaneyfield

### Qualifications

While Mr. Chaneyfield ostensibly has more experience than Ms. McDowell, there are still a few limitations to point out. First, his experience in law enforcement was overwhelmingly prior to the passage of the Trafficking Victims Protection Act (TVPA) in 2000:

1. 1985-1987: Smyrna Police Department
2. 1987-2002: Georgia Bureau of Investigation.

As such, although Mr. Chaneyfield claims to have "considerable experience" with sex crimes, including commercial sex and sex trafficking, it appears as though his purported "investigations" into instances of human trafficking were likely overwhelmingly limited

---

sexual exploitation-identification tool (CSE-IT)." Technical Report. Oakland, CA: WestCoast Children's Clinic, 2017.

[128] Basson, Danna. "Validation of the commercial sexual exploitation-identification tool (CSE-IT)." Technical Report. Oakland, CA: WestCoast Children's Clinic, 2017, page 8.

[129] See, for example *Supra* discussion of In re. Aarica S.

to his time as the Director of Global Threat Management for the InterContinental Hotels Group (IHG)—a position which he has held from 2002 to Present.

In his position at IHG, Mr. Chaneyfield should be aware of the fact that no hotel brand, regardless of interventions, is immune to being targeted by traffickers, commercial sex consumers, and consenting sex workers. In fact, commercial sex consumers discuss circumventing staff at IHG properties, such as Holiday Inn, as recent as earlier this month (see Figure 7 for example). Unfortunately, the clandestine crime of trafficking is extremely difficult to prevent.



**Figure 7. Commercial Sex Consumer Discusses Circumventing Staff at IHG Property Holiday Inn**

### *Opinions*

After discussing his qualifications, Mr. Chaneyfield contextualizes his opinions by providing what he terms as "an overview of sex trafficking and the hospitality industry." At the very outset of this "overview" Mr. Chaneyfield appears to conflate commercial sexual activity with sex trafficking, despite the fact that these are two different phenomena.

Then, Mr. Chaneyfield provides some legislative history of anti-trafficking laws in the United States and in Georgia, before discussing his four opinions and their respective basis.

*Chaneyfield Opinion 1 "Widely available and free anti-trafficking materials and trainings educate hotel owners and staff about the observable signs and indicators of sex trafficking and empower them to respond appropriately to potential trafficking situations[130]."*

While there may have been some available and free anti-trafficking materials during the alleged trafficking period in the present matter, there is no reliable evidence to suggest these materials have any effect on the ability of hotels to respond appropriately to potential trafficking situations, even as recent as this year (2023).  Mr. Chaneyfield cites to no reliable source to support this opinion and countervailing information is discussed further in Table 6.

---

[130] Chaneyfield Report Page 9.

**Table 6. Chaneyfield's Opinion 1 Claims and Countervailing Information**

| Chaneyfield Claims | Countervailing Information |
|---|---|
| "For years sex trafficking has been a well-known, well-documented problem at hotels nationwide." | As discussed in the *Supra* sections, this is demonstrably untrue. This issue is not "well-known" or "well-documented." Not only has the knowledge on trafficking been burgeoning since 2013, but the extant data suggests prevalence estimates are incredibly low. For example, in 2019 the hotel industry had 5.4 million guest rooms, with an average occupancy of 66%[131], leading to the service of over four million patrons per day. These numbers, along with data on calls for service/prosecutions, contradict the notion that sex trafficking at hotels is at an "epidemic" level of proportion. |
| "Since at least 2015, high-quality anti-trafficking training materials and programs have been widely available for free to hospitality participants, including hotel owners and operators in Atlanta." | As discussed in the *Supra* sections, this is demonstrably untrue. There are no "high-quality anti-trafficking training materials and programs" that have been empirically validated with acceptable rates of sensitivity and specificity for use in the hospitality industry. |
| "Training hotel staff makes a significant difference. With training, hotel staff can and do spot known indicators of sex trafficking and take appropriate action in response." | Mr. Chaneyfield has demonstrated limited to no experience or education on evaluating the efficacy of training protocols. Mr. Chaneyfield makes no citation because there is no document to suggest that hotel training has a "significant" impact on prevention, outcomes, or interventions. There are also no data to suggest that there is any statistically significant difference between trained staff and untrained staff on the ability to spot "trafficking." |
| "The importance of formal anti-trafficking training in the hospitality industry is not controversial or in dispute." | The content of these trainings are controversial and in dispute and Mr. Chaneyfield's lack of awareness of this dispute is concerning and potentially reflective of a limited understanding on the complexities of these issues. For example, some trainings are accused of doing more harm than good. [132] |
| "These various hospitality groups have promoted anti-trafficking trainings for years because such trainings are an effective method to reduce sex trafficking in the hospitality industry. For example, ECPAT-USA…" | Mr. Chaneyfield appears to ignore the fact that these groups are compensated for the trainings they promote (e.g. through grants, donations, or contracts), even if the compensation is not directly received from the consumers of the training. Moreover, Mr. Chaneyfield seems to omits fact that ECPAT-USA's dissemination materials have previously contained misinformation[133]. More importantly, there is absolutely no |

---

[131] AHLA. 2022.   AMERICAN HOTEL & LODGING ASSOCIATION 2022 MIDYEAR STATE OF THE HOTEL INDUSTRY REPORT. Retrieved from: https://www.ahla.com/sites/default/files/AHLA%20Midyear%20SOTI%20Report%202022.pdf

[132] For example, see Song, Sandra. (2019). When Anti-Sex Trafficking Policies like the Marriott's Do More Harm Than Good. Paper Magazine. Retrieved from: https://www.papermag.com/marriott-hotels-sex-trafficking-training-2627520121.html?rebelltitem=9#rebelltitem9

[133] For example, ECPAT slide deck for a presentation entitled "How to Approach Hotels"  included a purported "Key Statistic" that hotels should be aware of—"100,000 — 300,000 American children at risk for trafficking per year." This is a myth. See, for example, See for example: Klessler, Glenn. May 28, 2015. The bogus claim that 300,000 U.S. children are 'at risk' of sexual exploitation. The Washington Post. https://www.washingtonpost.com/news/fact-checker/wp/2015/05/28/the-bogus-claim-that-300000-u-s-children-are-at-risk-of-sexual-exploitation/  AND Klessler, Glenn. September 2, 2015. The fishy claim that '100,000' children in the United States are in the sex trade. The Washington Post.

| Chaneyfield Claims | Countervailing Information |
|---|---|
|  | reliable evidence to suggest that these trainings reduce the incidence of trafficking and anecdotally, trained hotels continue to unwittingly encounter trafficking. For example, even after donating money to ECPAT-USA, taking their training, and signing The Code, Marriott[134] and Hilton Worldwide[135] were sued as third parties to human trafficking allegations. Additionally, every major hotelier, including CWT, are implicated by commercial sex consumers online as still being locations where commercial sex is exchanged[136], despite their adherence to ECPAT's The Code. |
| "Formal anti-trafficking materials and programs have been essential for hotel staff for years, because they teach hotel staff the observable signs and red flag indicators of sex trafficking and equip and empower hotel staff to take appropriate action in response to those observable signs and red flag indicators." | There is no reliable basis for this statement. These programs are available as suggestions and purported "best practices." There is no reliable evidence base to suggest these programs work and anecdote suggests low rates of sensitivity and specificity. Trafficking is not an obvious crime that can be reliably assessed during the normal course of business. That is why it is so often misidentified even by trained law enforcement and medical health professionals. It is unclear why Mr. Chaneyfield appears to be attempting to hold the Defendant to a higher standard than law enforcement. |

Before moving on to Opinion 2, Mr. Chaneyfield decides to list a number of purported red flags, which are inaccurate, obsolete, unlikely to lead to intervention, and/or likely to lead to misidentification (see Table 7 for examples).

**Table 7. Sample of Chaneyfield Red Flags and Countervailing Information**

| Chaneyfield Claims | Countervailing Information |
|---|---|
| Hotel in high crime area with demonstrable history of commercial sex activity. | There is no empirical evidence to support this purported "indicum." I am not aware of any training protocol that included this indicum. However, to the extent this was featured in a training program, it is the role of law enforcement to address high crime and commercial sex activity is not synonymous with trafficking. In fact, most commercial sex exchanges are between consenting adults, not trafficked persons or minors. |
| Sex ads on the Internet (e.g., Backpage, Listcrawler, etc.) showing photos of the hotel, its rooms, and/or its guests, that tend to show that the hotel is being used for commercial sex. | Backpage was seized on April 6, 2018, so it is unclear why Mr. Chaneyfield referenced a website that was last active over five years ago. Moreover, when it was active, the photographs in advertisements were often fake, old, or from previous locations. While there were some tools |

https://www.washingtonpost.com/news/fact-checker/wp/2015/09/02/the-fishy-claim-that-100000-children-in-the-united-states-are-in-the-sex-trade/

[134] Law.com. August 10, 2021. Craigslist, Hilton, Marriott Sued Over Alleged Sex Trafficking Activity in South Florida. Retrieved from https://www.law.com/dailybusinessreview/2021/08/10/craigslist-hilton-marriott-sued-over-alleged-sex-trafficking-activity-in-south-florida/

[135] Law.com. August 10, 2021. Craigslist, Hilton, Marriott Sued Over Alleged Sex Trafficking Activity in South Florida. Retrieved from https://www.law.com/dailybusinessreview/2021/08/10/craigslist-hilton-marriott-sued-over-alleged-sex-trafficking-activity-in-south-florida/

[136] See for example, www.USASexGuide.nl

| | |
|---|---|
| | developed in recent years that were meant to try and automate detection using the information in ads, they were typically restricted to law enforcement (e.g. Spotlight). |
| Minor loitering in hotel common areas for extended periods. | There is no empirical evidence to support this purported "indicium." I am not aware of any training that included this indicum. However, to the extent this was featured in a training program, this is hypothesized to be at high risk of misidentification. |
| Minor wearing scant clothing around hotel common areas. | There is no empirical evidence to support this purported "indicium." Publicly criticized for policing adult female clothing choice and violations to rights to privacy[137] and at risk of misidentification, particularly in beach areas. |
| Minor loitering in hotel common areas during school hours and/or late at night. | There is no empirical evidence to support this purported "indicium." I am not aware of any training that included this indicum. However, to the extent this was featured in a training program, this is hypothesized to be at high risk of misidentification. |
| Minor loitering in hotel common areas with series of different older male guests. | There is no empirical evidence to support this purported "indicium." I am not aware of any training that included this indicum. However, to the extent this was featured in a training program, this is hypothesized to be at high risk of misidentification. |
| Minors traveling with adult guest/s to whom they do not appear to be related. | There is no empirical evidence to support this purported "indicium." At high risk of ensnaring mixed race families, as discussed in the *Supra* sections. |
| Minor traveling with limited luggage/clothing. | There is no empirical evidence to support this purported "indicium." Publicly criticized for potentially ensnaring female travelers traveling alone, particularly for business. |
| Request for extra towels and/or bedding disproportionate to nights stayed and listed occupants for guest room. | There is no empirical evidence to support this purported "indicium." Publicly criticized for potentially ensnaring female travelers. |
| Refusal of daily room cleaning/housekeeping. | There is no empirical evidence to support this purported "indicium." Following the COVID pandemic, refusal of cleaning services is common and, for disease safety, many hotels did not/do not provide it without explicit request. |
| Condoms, lubricants, weapons, numerous cell phones, and/or drug paraphernalia in guest room with minor occupant. | There is no empirical evidence to support this purported "indicium." Publicly criticized for potentially ensnaring sexual activity between consenting adults and violations to rights to privacy. Also, conflates indicia of drug offenses and sexual activity with "trafficking." |

---

[137] See, for example: Nolan Brown, Elizabeth. (2019). Are You a Woman Traveling Alone? Marriott Might Be Watching You. Reason. Retrieved from https://reason.com/2019/02/05/hotel-surveillance-state-sex-trafficking/ and Song, Sandra. (2019). When Anti-Sex Trafficking Policies like the Marriott's Do More Harm Than Good. Paper Magazine. Retrieved from: https://www.papermag.com/marriott-hotels-sex-trafficking-training-2627520121.html?rebelltitem=9#rebelltitem9

| | |
|---|---|
| Cash payments for daily rentals of room with minor occupant. | There is no empirical evidence to suggest that paying cash for a room is a reliable indicium of trafficking. Moreover, this is a common need for homeless populations, as well as for survivors of domestic violence and other persons in need of emergency and temporary housing. Claiming that "accepting cash" is an indication of human trafficking is not only unsupported by empirical research, but suggests an elitist, unreliable, and subjective perception of reality. Denying rooms to homeless populations, simply due to mode of payment, can have legal repercussions.[138] |

To that effect, Mr. Chaneyfield fails to provide any reliable information to suggest that any training has a statistically significant effect on the likelihood of staff identifying and intervening against sex trafficking. In fact, extant data suggests that trafficking interventions do not require specialized instruction, but rather rest on common-sense judgement and employment of a ubiquitous "see something, say something" intervention strategies. The challenge is that trafficking victims often do not self-identify as victims during their victimization and therefore do not present outwardly as a person in need of assistance. For example, the Plaintiff in the present matter can be seen laughing, joking, and/or dancing on video recording during her alleged trafficking period, which is ostensibly contradictory to what would be expected of a minor in a trafficked situation, which is also known as "modern slavery." As such, regardless of training, staff of any business are unlikely to intervene because the crime is clandestine and difficult to identify. This fact holds true similarly for trained and untrained law enforcement, as well as medical care providers.

*Chaneyfield Opinion 2 The United Inn fell far below the industry standard by failing to provide formal anti-trafficking training materials and training to its hotel staff members from 2017 – 2019.*

As explained at length in the *Supra* sections, the present risk of sex trafficking in the hospitality industry is unknown and Mr. Chaneyfield fails to cite to any reliable data on this issue. Similarly, while certain organizations recommend purported "best practice" trainings, these training materials and programs often contain misinformation and have no measurable impact on the rates of prevention, (mis)identification, or intervention. Any purported industry-wide standard should first be assessed for accuracy and efficacy before being used to impute liability for businesses that did not follow the so-called "standard". Mr. Chaneyfield further claims that his Opinion 2 is somehow supported by the IAPSC methodology. I find this claim to be ironic considering that Karim Vellani—a leading IAPSC expert and authority, proffered a countervailing opinion—*"The security measures in place at the United Inn and Suites were adequate in light of the crime risk.*

---

[138] In Ireland, a homeless family was awarded €22,000 in compensation after a hotel refused to honor their booking without a credit card. *See* Lucey, S., *Hotel discriminated against homeless family by demanding credit card*, Irish Legal News (Mar. 2, 2022), available at: https://www.irishlegal.com/articles/hotel-discriminated-against-homeless-family-by-demanding-credit-card.

*The United Inn and Suites had a reasonable security program, consisting of a multi-pronged approach to mitigating risk. Defendants met the applicable standard of care relating to security"[139].* Additionally, I was recently an invited speaker on human trafficking at the 2023 IAPSC Conference, where I cautioned security experts like Chaneyfield on issues of epistemic trespassing and erroneous support for unfounded opinions.

*Chaneyfield Opinion 3 "United Inn failed to follow hotel safety and security industry standards during the relevant period pertaining to guest security and safety. The United Inn also failed to follow industry standards on assessing risk of commercial sexual activities and responding accordingly."*

Again, as explained at length in the sections above, commercial sex is not synonymous with sex trafficking. In fact, the majority of commercial sex is not sex trafficking[140]. Moreover, organizations such as Amnesty International[141] advocate for the decriminalization of commercial sexual activities, which is now a practice in certain areas such as New York City. Nevertheless, in the sub-section termed "Reasons for Opinion 3" Mr. Chaneyfield continues to apparently conflate these concepts and base his opinion on unsupported speculation and subjective belief, while misciting information that he does not appear to fully understand. For example, in this section, Mr. Chaneyfield claims that "Broken Windows" theory applies to his assessment of the presentation  of alleged disorder at the hotel. This is, again, a form of epistemic trespassing. Mr. Chaneyfield is not a trained criminologist and should not be haphazardly citing a criminological theory without providing adequate context. Broken Windows policing is not universally accepted and has actually been viewed as less favorable to evidence-based policing. Moreover, Broken Windows theory has been criticized for leading to aggressive, order-maintenance policing strategies in many jurisdictions; which are drawing millions of individuals into the criminal justice system for minor offenses[142]. There is no reliable, empirical evidence to suggest that Broken Windows policing strategies have a measurable impact on trafficking prevalence or incidence.

---

[139] See Karim Vellani Expert Reports GW and AG, Page 36.

[140] For example, available estimates suggest there are between one million to two million sex workers in the United States, while there are only estimated to be 15,000 to 300,000 victims of sex trafficking. Even if the highest estimates are assumed to be true, this suggests that less than 30% of sex workers are victims of trafficking, but potentially less than 1%. Small sample studies of sex worker populations support the reality that most sex workers are not trafficked. For example, according to Conflict and Agency Among Sex Workers and Pimps: A Closer Look at Minor Domestic Sex Trafficking (2016), pimps were responsible for initiating into sex work 16 percent of the females, 1 percent of the males, and none of those who were transgendered. At 8.1 percent overall, pimp initiation was far less common than peer initiation by a friend (47 percent) or customer initiation (23 percent). In Atlantic City where the researchers interviewed sex workers who were 16 to 24 years old, they found that those who first entered when over 18 years of age reported being approached by a pimp at nearly twice the rate of those whose entry occurred when they were minors, and "self- initiation" was roughly twice as common among minors as those who entered after 18 years of age.

[141] Amnesty International. 2016. Amnesty International publishes policy and research on protection of sex workers' rights. Available at: https://www.amnesty.org/en/latest/news/2016/05/amnesty-international-publishes-policy-and-research-on-protection-of-sex-workers-rights/

[142] Howell, K. Babe. "Broken lives from broken windows: The hidden costs of aggressive order-maintenance policing." *NYU Rev. L. & Soc. Change* 33 (2009): 271.

Finally, and most importantly, Mr. Chaneyfield's interpretation of testimony illustrates how he has a fundamental misunderstanding of how commercial sex exchanges occur, much less trafficking. For example, Mr. Chaneyfield notes that a member of the Vice Unit for the Dekalb County Police Department testified that "ads for commercial sex at the United Inn frequently appeared on the Internet during the relevant period." Mr. Chaneyfield acknowledges that this testimony "bolsters" his opinion that "the hotel ignored the issue of commercial sex activity on its property, which is a violation of industry standards." However, Mr. Chaneyfield ignores the fact that, if accepted as true, law enforcement also had access to these same advertisements during the relevant time period. To that effect, commercial sex ads very rarely include the precise address of the location of where a commercial sex exchange will occur. This is done to evade detection by third parties, including law enforcement. Instead, commercial sex providers will use a "two-call" system. As defined above, the commercial sex consumer will call twice for in-call commercial sex providers: first, to set up an appointment time and obtain general directions to the in-call location, and second, to obtain specific information on which hotel room or apartment the sexual services will be provided. Therefore, it is more likely than not that there was no overt sign that commercial sex activity was occurring on the Defendant's property that could have reliably led to an intervention. As such, regardless of whether the hotels representatives were routinely monitoring online reviews about the United Inn during the relevant period, online reviews alone do not contain any reliable indicia of sex trafficking. While these advertisements can include generalizable information that may be indicia of commercial sex, sex trafficking is not synonymous with commercial sex and it would be challenging to identify a particular room or customer without further, in-depth, law enforcement-like investigation and/or a sting.

*Chaneyfield Opinion 4 "In my opinion, with adequate training and security measures in effect at the United Inn consistent with industry standards during the relevant time, it is more likely than not that the subject incidents described in the Complaints could have been prevented or avoided."*

Again here, Mr. Chaneyfield has failed to provide any reliable information to support his opinion and instead relies on unsupported speculation and/or subjective belief. There are no reliable data to suggest that the United Inn could have prevented the Plaintiff's victimization. There are no evidence-based indicators or red flags of trafficking, which is why it is so frequently misidentified by trained law enforcement, social service providers, and medical officials. There is no evidence base on the adequacy of training and qualitative data suggests that even trained hoteliers misidentify trafficking at comparable rates to untrained staff. Mr. Chaneyfield's opinion that the Defendant's staff would have been in a position to prevent and/or stop the trafficking alleged in the Complaints if they had been trained is utterly baseless.

Instead of relying on any empirical data, Mr. Chaneyfield cites to purported "best practices" published by organizations such as ECPAT[143]. However, Mr. Chaneyfield fails to acknowledge that at many (if not most) of the hotels that have taken ECPAT's trainings

---

[143] See, for example, Chaneyfield Report, Pages 21-23.

and/or joined as members of ECPAT's "Code" are currently being sued for allegations of trafficking on premises, despite the implementation of these training programs. For example, Carlson[144], Hilton[145], Wyndham[146], Hyatt[147], and others.  This demonstrates how companies who take (what Mr. Chaneyfield considers to be commendable) efforts to combat the human trafficking scourge can still encounter victimizations without their foreknowledge. Moreover, this illustrates a fact that I have repeated throughout—there is no evidence to suggest that training or lackthereof has any measurable impact on the ability to identify trafficking in the hospitality industry with any degree of reliability or statistical significance.

## XI.   SECONDARY EXPLOITATION

Given the increased international attention on human trafficking, more service providers, practitioners, and politicians are becoming involved in the movement for modern-day abolitionism. However, the incentive for assisting victims of human trafficking is not always entirely altruistic. Qualitative data suggest that there are an increasing number of third parties who are secondarily exploiting human trafficking survivors, as well as persons erroneously identified as victims, and the topic of human trafficking in general.

Secondary exploitation can take many forms. Generally, it can be defined as the act of making use of or benefiting from a human trafficking survivor's victimization or the human trafficking phenomenon[148]. For example, a human trafficking survivor could be exploited by a third party who wants to tell the victim's story in order to draw attention to themselves

---

[144] Mehlman-Orozco, Kimberly. (2017) Hidden in Plain Sight: America's Slaves of the New Millennium. Praeger. Between April 15, 2016-April 15, 2017 Radisson was mentioned 10 times by commercial sex consumers in USASexGuide.info and 161 times in InternationalSexGuide.info. For example, on May 27, 2016, one man claimed that women could be purchased for sex in the bar of the Radisson Blu Hotel in Riga, Latvia. Additionally, despite their efforts, sex trafficking stings have implicated Carlson hotels. For example, McMullen, Maureen (May 23, 2017). Charges: Couple ran 'large-scale' sex trafficking enterprise in Washington County. The Bemidgji Pioneer. Retrieved from: http://www.bemidjipioneer.com/news/4271802-charges-couple-ran-large-scale-sex-trafficking-enterprise-washington-county

[145] https://www.law.com/dailybusinessreview/2021/08/10/craigslist-hilton-marriott-sued-over-alleged-sex-trafficking-activity-in-south-florida/

[146] https://news.bloomberglaw.com/white-collar-and-criminal-law/sex-trafficking-claims-against-wyndham-hotels-survive-dismissal

[147] https://www.dallasnews.com/news/courts/2019/12/12/sold-for-sex-since-age-4-woman-sues-dallas-area-hotels-she-says-looked-the-other-way/

[148] Mehlman-Orozco, Kimberly. (2017). Hidden in Plain Sight: America's Slaves of the New Millennium. Praeger.

or their organization[149]. Politicians also use human trafficking and/or the stories of victimizations to help themselves get elected[150].

As a human trafficking expert witness, I've found that an increasing number of tort attorneys are beginning to file lawsuits against third party businesses for "facilitating human trafficking" when the facts, in my view, do not support these accusations. Moreover, the experiences of survivors post-rescue, during litigation, often provide countervailing evidence to the purported "altruistic" effort by Plaintiff attorneys to assist their clients.

Human traffickers should undoubtedly be held criminally and civilly accountable for their crimes and human trafficking survivors should be provided with services and protected from revictimization and erroneous criminalization. However, in my experience, efforts to hold third parties liable, despite no substantive and/or direct involvement with the crime, are at risk of secondarily exploiting the victims and/or secondarily exploiting the topic of trafficking by proffering non-victims as trafficking survivors.

---

[149] For example, see Cojocaru, C. (2016). My experience is mine to tell: Challenging the abolitionist victimhood framework. Anti-Trafficking Review, (7), 12-38; Gregoriou, C., & Ras, I. A. (2018). Representations of transnational human trafficking: A critical review. Representations of Transnational Human Trafficking: Present-day News Media, True Crime, and Fiction, 1-24 and Bernstein, E., & Shih, E. (2014). The erotics of authenticity: Sex trafficking and 'reality tourism' in Thailand. Social Politics: International Studies in Gender, State and Society, 21(3), 430–460.

[150] Mehlman-Orozco, Kimberly. (2017). In Virginia race, human trafficking must be more than a talking point. *The Hill*. Retrieved from: http://thehill.com/opinion/campaign/358814-in-virginia-race-human-trafficking-must-be-more-than-a-talking-point

## XII.  CONCLUSION

Due to the clandestine nature of the crime, sex trafficking victims are frequently misidentified and often self-identify as "prostitutes" or co-conspirators during their trafficking period. As a consequence of misidentification, sex trafficking victims are typically denied services and erroneously criminalized, while facing multiple missed opportunities for intervention and rescue—a phenomenon known as a sentinel event. Additionally, victims of trafficking are known to have multiple or different traffickers, a phenomenon known as "choosing up." Victims of trafficking are known to vacillate from being trafficked, engaging in consenting adult sex work, engaging in consenting pornography, and engaging in survival sex. Given the fluid status that can affect many trafficking victims, misidentification and erroneous criminalization is problematic.

Even law enforcement frequently misidentifies victims of trafficking, including minors.

To retroactively correct the erroneous criminalization faced by human trafficking victims in the criminal justice system, an increasing number of states have passed vacatur statues and safe harbor laws.[151] These laws can provide post-conviction relief for survivors of human trafficking by completely erasing criminal convictions related to their victimization. By one count, 18 states had passed vacatur statutes and another 10 states had enacted partial vacatur laws by 2017.[152] By 2013, 18 states had passed safe harbor laws.[153] As previously discussed, in 2015 Georgia passed a safe harbor law in an attempt to address this systemic issue of misidentification.

Despite raising awareness and legal adjustments, victims of sex trafficking continue to be misidentified and erroneously criminalized. It is extremely difficult to identify a victim of sex trafficking without in-depth information and/or self-identification. Sex traffickers go to great lengths to conceal their exploitation. Indicia of prostitution and/or drug addiction are often erroneously conflated with indicia sex trafficking. Extant indicia of sex trafficking have not been evaluated for sensitivity or specificity in the hospitality industry, but it is hypothesized to be low.

The contention that the Defendant knew or should have known about the Plaintiff's alleged victimization appears to be based on misinformation, unsupported speculation, conjecture, fallacies of composition, and/or ecological fallacies, and are not supported by state-of-the-science research. They offer no reliable basis to suggest that the Plaintiff's victimization was "open" or "obvious." Based on the evidence in this case and my expertise on the identification of sex trafficking victims, it is not reasonable to conclude that the Plaintiff's victimization would have been prevented if the Defendant required human trafficking training prior her alleged trafficking period, which was for approximately two months in mid-2017. Extant information suggests that trainings

---

[151] Mehlman-Orozco, Kimberly B. and Simon Hedlin. (2017). "Mehlman-Orozco, Hedlin: Stop criminalizing victims of sex trafficking." The Houston Chronicle.
[152] https://www.ncjw.org/wp-content/uploads/2017/07/Fact-Sheet_Vacatur-Laws_Updated-2016.pdf
[153] Mehlman-Orozco, Kimberly B. (2015) "Safe Harbor legislation for juvenile victims of sex trafficking: A myopic view of improvements in practice." *Social Inclusion*. 3. 1: 52-62.

available to the hospitality industry in 2017 and earlier contained misinformation and were likely to have low rates of sensitivity and specificity, as discussed previously.

Extant data suggests that while law enforcement was mandatorily trained on trafficking in Georgia at the time of the Plaintiff's victimization, these trainings did not specifically incorporate material on Commercial Sexual Exploitation of Children. Moreover, even law enforcement trainings had a questionable evidence base, at best, at the time and law enforcement continued to misidentify victims, despite being trained.

Yet, the Plaintiff and her named experts appear to be attempting to hold the Defendant to a higher standard than law enforcement. Forcing an unproven standard supported by myths and erroneous "statistics", without establishing an evidence base, is a systemic issue that has historically resulted in a negative impact on criminological interventions in the United States. The passage of Stop Enabling Sex Traffickers Act (SESTA) and Fight Online Sex Trafficking Act (FOSTA), for example, was intended to impede the sale of children online, but the result is that advertisements have been displaced to overseas platforms and dispersed across the Internet and the dark web, which has further inhibited the ability of law enforcement to catalyze rescues and arrests. Similarly, while the knee-jerk reaction to TVPRA litigation was to adopt trainings developed by anti-trafficking non-profits, there is no reliable empirical evidence to conclude that these trainings have any significant impact on the prevention of crimes, much less the detection of offenders or victims. In fact, some of these trainings have been publicly criticized for resulting in erroneous profiling, as discussed in the *Supra* sections.

While the Plaintiff and her proposed experts have attempted to draw causal inference between the time her trafficker allegedly kept her at the Defendant's property and her trafficking, they provide no reliable evidence to support these contentions. Moreover, both the Plaintiff and her proposed experts appear to ignore the multiple missed opportunities at prevention and intervention by other actors (e.g. school officials, medical health providers, family and friends). It is more likely than not that each and every one of these groups of actors had more knowledge and direct involvement with the Plaintiff than the Defendant's employees.

# APPENDIX A. Curriculum Vitae

## DR. KIMBERLY B. MEHLMAN-OROZCO

(703) 362-9405  ■  kim@mehlmanorozco.com  ■  www.mehlmanorozco.com

<u>EDUCATION</u>

**Doctor of Philosophy**                                      Criminology, Law and Society
                                                             George Mason University
*Dissertation:* The "Crimmigration" Affect: An Analysis of 287(g) and Latino/a Representation in the U.S. Juvenile Justice System
*Expertise:* Human Trafficking, Human Smuggling, Immigration, Survey Methods and Systematic Review

**Master of Arts**                                           Justice, Law, and Crime Policy
                                                             George Mason University
*Thesis:* Foreign Nationals and Crime: An Exploratory Analysis of Undocumented Migrants in Northern Virginia

**Bachelor of Science**                                      Administration of Justice
                                                             George Mason University

*Cum Laude*

<u>TEACHING EXPERIENCE</u>

**Surviving and Thriving Beyond Sex Trafficking** SP18
                                                             Ph.D. Research Course
                                                             Sustainability Education
                                                             Prescott College

**CRIM307 Social Inequality, Crime, and Justice** FA17
                                                             Criminology, Law and Society
                                                             George Mason University

**CRIM405 Law and Justice Around the World**      SP17, SP18
                                                             Criminology, Law and Society
                                                             George Mason University

**CRIM308 Human Rights and Justice**              FA16
                                                             Criminology, Law and Society
                                                             George Mason University

**CCJS100 Intro to Criminal Justice**             FA12-SP14
                                                             Department of Criminology & Criminal Justice
                                                             University of Maryland College Park

**CCJS370 Race and Crime**                        FA12-SP14
                                                             Department of Criminology & Criminal Justice
                                                             University of Maryland College Park

**CCJS432 Law of Corrections**

FA12
Department of Criminology & Criminal Justice
University of Maryland College Park

**CCJS418J Foreign Nationals and Crime**

FA12-SP13
Department of Criminology & Criminal Justice
University of Maryland College Park

**CRIM490 Foreign Nationals and Crime**

SU09, SU10, SU11, SU12
Criminology, Law and Society
George Mason University

**GED, Work Place Essential Skills,
and Adult Basic Education**

SU05-SU06
Adult Detention Center
Prince William County

RESEARCH EXPERIENCE

**CEO**

FA19– Present
Break the Chain

**Executive Director**

WI18– Present
Freedom Light

**Partner/Human Trafficking Expert Witness**

FA16– WI18
Mahn, Mehlman & Associates

**Human Trafficking Subject Matter Expert**

SU16-FA17
RAND Corporation

**Executive Director/Human Trafficking Consultant**

WI12– FA16
The Justitia Institute

**Director**

FA10 – WI12
Latino Policy Institute
Roger Williams University

**Research Associate**

SU11 – WI12
Cochrane Collaboration College for Policy
George Mason University

**Lead Clinical Trials Search Coordinator**

SU10 – WI12
Justice Health Field
The Cochrane Collaboration

**Senior Research Associate**

SU08 – SU11
OJJDP Census of Juveniles on Probation
George Mason University

**Graduate Research Assistant**

SU10 – FA10
Violence and Victimization Research Division

|  | National Institute of Justice (On Contract) |
|  | Office of Justice Programs |

**Senior Fellow**

SU08 – FA10
The Lloyd Society

**Graduate Research Assistant**

SU06 – SU08
Trinidad & Tobago Crime Reduction Project
George Mason University

**Graduate Research Assistant**

WI07-SP07, SP08
OJJDP Vaccines for Children Project
George Mason University

PUBLICATIONS

Lowery-Keith, Jennifer and **Kimberly Mehlman-Orozco** (2022). 'Justice Denied': A Sex Trafficking Survivor Tells Her Story. The Crime Report.

**Mehlman-Orozco, Kimberly B** and Greg Bristol. (2021). Suing Social Media Sites Won't Curb Sex Trafficking: Advocates. The Crime Report.

**Mehlman-Orozco, Kimberly B** and Marisa A. Trasatti. (2021). "Does 'Nirvana' Lawsuit Undermine Struggle Against Trafficking?" The Crime Report.

**Mehlman-Orozco, Kimberly B** and Marisa A. Trasatti. (2021). "Britney Spears, human trafficking and the law." New York Daily News.

**Mehlman-Orozco, Kimberly B**. (2021). "The 'Racialization' of Sex Trafficking in America." The Crime Report.

**Mehlman-Orozco, Kimberly B**. (2021). "COVID-19, the Commercial Sex Industry and Sex Trafficking." The Crime Report.

**Mehlman-Orozco, Kimberly B**. (2019). "Jeffrey Epstein's deal with Alexander Acosta wasn't out of line with what I have seen." USA Today.

**Mehlman-Orozco, Kimberly B**. and Sheriff William D. Snyder. (2019). "Robert Kraft spa scandal: Sex trafficking is hard to prove, that doesn't mean it's a lie." USA Today.

**Mehlman-Orozco, Kimberly B**. and William D. Snyder. (2019). "Legalizing prostitution could end sex-trafficking investigations." The Hill.

**Mehlman-Orozco, Kimberly B**. (2019). "How to Fight Sex Trafficking." Politico.

**Mehlman-Orozco, Kimberly B**. (2019). The Jihadi Next Door: How ISIS is Forcing, Defrauding, and Coercing Your Neighbor into Terrorism. SkyHorse.

**Mehlman-Orozco, Kimberly B**. (2018). "Sex trafficking bill likely to do more harm than good." The Baltimore Sun.

**Mehlman-Orozco, Kimberly B.** (2018). "Why cracking down on websites won't stop online sex trafficking." *Thomson Reuters Foundation.*

**Mehlman-Orozco, Kimberly B.** (2018). "Legislation Aiming to Stop Sex Trafficking Would Hurt Investigations." *Homeland Security Today.*

**Mehlman-Orozco, Kimberly B.** (2017). "Trafficking victims get lost under unjust criminal convictions." *The Hill.*

**Mehlman-Orozco, Kimberly B.** (2017). "Projected Heroes and Self-Perceived Manipulators: Understanding the Duplicitous Identities of Human Traffickers." *Trends in Organized Crime.*

**Mehlman-Orozco, Kimberly B.** (2017). Hidden in Plain Sight: America's Slaves of the New Millennium. ABC-CLIO/Praeger.

**Mehlman-Orozco, Kimberly**. (2017). "Why we should question the FBI's recent human trafficking sting." *Thomson Reuters.*

**Mehlman-Orozco, Kimberly**. (2017). "Decriminalize sex work to bring trafficking victims out of the shadows." *The Hill.*

**Mehlman-Orozco, Kimberly**. (2017). "Decriminalizing sex work would help bring victims out of the shadows." *The Washington Post.*

**Mehlman-Orozco, Kimberly B.** (2017). "Why the Stop Enabling Sex Traffickers Act is the Wrong Solution." *The Crime Report.*

**Mehlman-Orozco, Kimberly B.** (2017). "Identifying Victims of Human Trafficking." *Dimensions of Dental Hygiene.*

Syme, Sheryl, Camardese, Susan, and **Kimberly Mehlman-Orozco.** (2017). "Human Trafficking: Red Flags for Dental Professionals." *Decisions in Dentistry.*

**Mehlman-Orozco, Kimberly B.** (2017). "Vilifying Backpage.com won't help fight sex trafficking" *The Washington Post.*

**Mehlman-Orozco, Kimberly B.** (2017). "Child Trafficking: The Tragedy of 'Princess'" *The Crime Report.*

**Mehlman-Orozco, Kimberly B.** (2017). "To sue or not to sue third-party businesses for sex trafficking?" *Thomson Reuters Foundation.*

**Mehlman-Orozco, Kimberly B.** (2017). "Hunting the Internet's Sex Predators." *The Crime Report.*

**Mehlman-Orozco, Kimberly B.** (2017). "Will shutting down Backpage.com end the scourge of child sex trafficking in America?" *Thomson Reuters Foundation.*

**Mehlman-Orozco, Kimberly B.** (2017). "Sex Trafficking: A Surprising Rescue Story." *The Crime Report.*

**Mehlman-Orozco, Kimberly B.** (2017). "What every parent should know about sex trafficking." *Baltimore Sun.*

**Mehlman-Orozco, Kimberly B.** and Simon Hedlin**.** (2017). "Mehlman-Orozco, Hedlin: Stop criminalizing victims of sex trafficking." *The Houston Chronicle.*

**Mehlman-Orozco, Kimberly B.** (2017). "Why Do We Criminalize Young Victims of Sex Trafficking?" *The Crime Report.*

**Mehlman-Orozco, Kimberly B.** (2016). "The Plight of Sex-Trafficking Survivors." *The Gay and Lesbian Review Worldwide.*

**Mehlman-Orozco, Kimberly B.** (2016). "Sex Trafficking is often hidden in plain sight." *The Hill.*

**Mehlman-Orozco, Kimberly B.** (2016). "Will Legalized Prostitution End the Sex Trafficking Scourge?" *The Huffington Post.*

**Mehlman-Orozco, Kimberly B.** (2016). "What happens after a human trafficking victim is rescued?" *The Hill.*

**Mehlman-Orozco, Kimberly B.** (2016). "The Reality of Sex Trafficking in Washington's Red Light District." *Baltimore Sun.*

**Mehlman-Orozco, Kimberly B.** (2016). "America's Symbolic, Not Effective, Anti-Trafficking Policy. *Diplomatic Courier.*

**Mehlman-Orozco, Kimberly B.** (2016). America's Anti-Trafficking Efforts: Hollow victories for public accolade. *Connection Newspapers*: Chantilly, Centerville, Great Falls, Herndon, McLean, & Vienna.

**Mehlman-Orozco, Kimberly B.** (2016). "Sex Slaves or Prostitutes?: How Human Trafficking is Hidden in Plain Sight in America's Capital." *Diplomatic Courier.*

**Mehlman-Orozco, Kimberly B.** (2015). "Safe Harbor Legislation for Juvenile Victims of Sex Trafficking: A Myopic View of Improvements in Practice. *Social Inclusion.*

**Mehlman-Orozco, Kimberly B.** (2015). "Tor and the Bitcoin: An Exploration into Law Enforcement Surveillance Capability Online". *Diplomatic Courier.*

**Mehlman-Orozco, Kimberly B.** (2015). "My nail salon may be a front for a brothel." *The Washington Post.*

**Mehlman-Orozco, Kimberly B.** (2014). "Human Trafficking in the Philippines: A Blemish on Economic Growth". *Diplomatic Courier, Recovery in the Philippines.*

**Mehlman-Orozco, Kimberly B.** (2014). "Devoid of Research: An Evaluation of Human Trafficking Interventions". *Diplomatic Courier, Special Issue: Breaking the Cycle of Human Trafficking.*

Martinez, Ramiro, and **Mehlman-Orozco, Kimberly B.** (2014). "Hispanic Immigration and Crime". <u>Oxford Handbook of Ethnicity, Crime, and Immigration</u>. Eds. Michael Tonry and

Sandra Bucerius. Oxford University Press.

**Mehlman-Orozco, Kimberly B.** (Contributing Author) (2010) "Breaking It Down: Justice, Law & Society Abstracts for Policymakers and Practitioners". *Center for Justice Law and Society.*

REPORTS

**Mehlman-Orozco, Kimberly B.** (2022). W.K. et. al., v. Red Roof Inn, et. al. Civil Action Number 1:20-cv-5263.VHC.

**Mehlman-Orozco, Kimberly B.** (2022). Jane Does 1-4. v. Red Roof Inn, et. al. Civil Action Number 1:21-cv-04278-WMR.

**Mehlman-Orozco, Kimberly B.** (2022). J.A.. v. Red Roof Inn, et. al. Civil Action Number 1:21-cv-03655-TWT.

**Mehlman-Orozco, Kimberly B.** (2022). N.Z. v. Red Roof Inn, et. al. Civil Action Number 02642.

**Mehlman-Orozco, Kimberly B.** (2022). G.D. v. Red Roof Inn, et. al. Civil Action Number 02631.

**Mehlman-Orozco, Kimberly B.** (2022). Jane Doe v. Fairfax County Police. 1:21cv1150(AJT/JFA).

**Mehlman-Orozco, Kimberly B.** (2022). S.Y. v. Inn of Naples Hotel LLC and Inn of Naples, LLC. Case No.: 2:20-cv-00609-JES

**Mehlman-Orozco, Kimberly B.** (2022). S.Y. v. Naples Hotel Company and the Gulfcoast Inn of Naples Owners Association, Inc. 2:20-cv-00608

**Mehlman-Orozco, Kimberly B.** (2022). C.S. v. Inn of Naples Hotel, LLC and Inn of Naples, LLC 2:20-cv-00629

**Mehlman-Orozco, Kimberly B.** (2022). C.S. v. Naples Hotel Company and the Gulfcoast Inn of Naples Owners Association, Inc. 2:20-cv-00631

**Mehlman-Orozco, Kimberly B.** (2022). The People of the State of California v. Rachele Eschenburg. Case Number: FCR350232

**Mehlman-Orozco, Kimberly B.** (2022). People of the State of California v. Diane Mirabal. Superior Court of the State of California for the County of Santa Clara. Case No.: 98312

**Mehlman-Orozco, Kimberly B.** (2022). Casilao et. al. v. Hotelmacher LLC, et. al. Case No.: CIV-17-800-SLP

**Mehlman-Orozco, Kimberly B.** (2022). Jane Doe v. TRX Insurance Services, Inc and Richard Metz. United States District Court for the Eastern District of Pennsylvania. Civil Action No. 2:20-cv-04095-MMB

**Mehlman-Orozco, Kimberly B.** (2021). Expert Witness Report. *Heidi Gilbert, Amber Means, Mandy Meloon, Gabriela Joslin, and Kay Poe, v. U.S.A Taekwondo, Inc.,* District of Colorado. 1:18-cv-00981-CMA-MEH

**Mehlman-Orozco, Kimberly B.** (2020). Expert Witness Report. *M.B. v. Roosevelt Inn, LLC, et al.*.

**Mehlman-Orozco, Kimberly B.** (2017). Expert Witness Report. Keo Ratha et. al. v. Phatthana Seafood Co., et. al. Case No. 16-2-28453-1 KNT.

**Mehlman-Orozco, Kimberly B.** (2017). Expert Witness Report. *State of Ohio v. Michael Moore.* CR 16-3191.

**Mehlman-Orozco, Kimberly B.** (2011). The Effects of In-State Tuition for Non-Citizens: A Systematic Review of the Evidence. *Latino Policy Institute at Roger Williams University.* http://www.rwu.edu/depository/lpi/lpi-report.pdf

**Mehlman-Orozco, Kimberly B.** (2008). Race and Reporting Burglary, Robbery, and Assault in Trinidad and Tobago. (Completed under a grant from the Trinidad and Tobago Government*).*

SCHOLARLY PRESENTATIONS

Trasatti, Marisa and **Mehlman-Orozco, Kimberly B**. (2022). Hotel Industry and Human Trafficking. South Carolina Bar Convention.

Trasatti, Marisa and **Mehlman-Orozco, Kimberly B.** (2021). Human Trafficking Is Growing Exponentially: What your Corporation and Clients Need to Know about the Evolving Litigation Landscape. Lawyers for Civil Justice Conference.

Trasatti, Marisa, **Mehlman-Orozco, Kimberly B.**, Harvey, Brittany. (2021). Human Trafficking: The Silent Risk. RIMS Annual Conference.

Trasatti, Marisa, **Mehlman-Orozco, Kimberly B.**, Yesowitch, Irene, Vorndran, Maryann, and Miller, Graham. (2020). Training to Combat Human Trafficking at Your Commercial Premise. Cyber, Management & Professional Liability Conference.

Trasatti, Marisa, **Mehlman-Orozco, Kimberly B.**, Clark, Fran, et. al. (2020). Training to Combat Human Trafficking at your Commercial Premise– Learn the Emerging Risks, Litigation Issues and Preventative Measures. Claims and Litigation Management Alliance Conference.

Trasatti, Marisa, **Mehlman-Orozco, Kimberly B.**, Ewing, Lance. (2020). Human Trafficking: The Silent Risk. Claims and Litigation Management Alliance Conference.

**Mehlman-Orozco, Kimberly B.** (2019). Keynote Speaker: National Capital Region Threat Intelligence Consortium  (NTIC) Human Trafficking Seminar.

**Mehlman-Orozco, Kimberly B.** (2019). Law Enforcement's Role in Combating Human Trafficking and Assisting Victims. Police Executive Research Forum (PERF).

**Mehlman-Orozco, Kimberly B.** and Marisa Trasatti (2019). Human Trafficking: The Silent Risk. The RIMS (Risk Management Society) Conference.
**Mehlman-Orozco, Kimberly B.** (2019). Social Policy and Justice Panelist. Harvard College Project of Asian and International Relations. Harvard University.

**Mehlman-Orozco, Kimberly B.** (2018). Women in Homeland Security Human Trafficking Symposium Panelist. Marymount University.

**Mehlman-Orozco, Kimberly B.** (2017). Human Trafficking Symposium Panelist. Liberty University School of Law.

Martin, Favian, **Mehlman-Orozco, Kimberly**, and Wooditch, Alese. (2014). Mexican Migration to the United States: An Exploratory Study into Illegal Border Crossings. Academy of Criminal Justice Sciences. Philadelphia, PA

**Mehlman-Orozco, Kimberly B.** (2010). "Justice Health Systematic Review Methods," Presented at the annual colloquium of the Cochrane and Campbell Collaborations: Keystone, CO.

**Mehlman-Orozco, Kimberly B.** (2010). "Open Access Systematic Reviews for Juvenile Probation Information," Presented at the first annual OJJDP Probation Summit: Washington, D.C.

**Mehlman-Orozco, Kimberly B.,** Chirieleison, J., Sebold, C. M., Douds, A., Gallagher, A.M., and Gallagher, C.A. (2010). "Characteristics of Juveniles on Probation: Collecting Data from Atlantic to Pacific". Presented at the 2010 American Probation and Parole Association Conference: Washington, D.C.

**Mehlman-Orozco, Kimberly B.** (2010). "Justice Health Search Methods: PubMed and More," Presented at the International Network for Justice Health Meeting: Scottsdale, AZ.

Gallagher, C.A., Douds, A.S., **Mehlman-Orozco, Kimberly B.,** Chirieleison, J., and Olaghere, A. (2010). "Justice Health Bibliographic Data Mapping," Presented at the International Network for Justice Health Meeting: Scottsdale, AZ.

**Mehlman-Orozco, Kimberly B.** (2010). "Smuggling and the Likelihood of Detention among Undocumented Migrants," Law and Society Association Conference: Chicago, IL.

Douds, Anne S. and **Mehlman-Orozco, Kimberly B.** (2010). "FASD in Justice Facilities: What does the research tell us?", Meeting of the Interagency Coordinating Committee on Fetal Alcohol Spectrum Disorders: Rockville, MD.

Gallagher, Catherine, Taxman, Faye, Kinner, Stuart, Doyle, Jodie, Pardo-Rengifo, Monica, **Mehlman-Orozco, Kimberly B.,** Olaghere, Ajima, Royle, Nick, Gabriel Cuervo, Luis. (2009). "Knowledge mapping for research prioritization: examples from the Network for Justice Health". 17th Cochrane Colloquium, Singapore.

**Mehlman-Orozco, Kimberly B.** (2009). "Justice Health Systematic Review Methods," Presented at the International Network for Justice Health Meeting: Orlando, FL.

**Mehlman-Orozco, Kimberly B.** (2008). "Foreign Nationals and Crime: An Exploratory Analysis of Undocumented Migrants in Northern Virginia," American Society of Criminology Conference: St. Louis, MO.

OTHER PRESENTATIONS

**Mehlman-Orozco, Kimberly B.** (2018). Invited Trainer on Human Trafficking Provided to the

Advancing the Business of Healthcare Medical Coding Chapter in Woodbridge, Virginia (2 CEUs).

**Mehlman-Orozco, Kimberly B.** (2018). Invited Trainer on Human Trafficking for the Canadian Police College Human Trafficking Investigator's Course, Royal Canadian Mounted Police and Halifax Regional Police, Canada.

**Mehlman-Orozco, Kimberly B.** (2018). Invited Annual Speaker for the College of Humanities and Social Sciences Degree Celebration, George Mason University.

**Mehlman-Orozco, Kimberly B.** (2018). Invited Presenter for the Well Library Honors Event, George Mason University.

**Mehlman-Orozco, Kimberly B.** (2017). Invited Training Presentation on Human Trafficking Red Flags for Prevent Abuse and Neglect through Dental Awareness (P.A.N.D.A).

**Mehlman-Orozco, Kimberly B.** (2017). Invited Guest Speaker for Human Trafficking Awareness Event with Kappa Delta Phi International Sorority, George Mason University.

**Mehlman-Orozco, Kimberly B.** (2017). Invited Guest Speaker at the Mother's Union International Conference Human Trafficking Forum.

**Mehlman-Orozco, Kimberly B.** (2017). Invited Guest Speaker at the Keeping Our Youth Safe Conference. Bernadette's House.

**Mehlman-Orozco, Kimberly B.** (2016). Invited Guest Speaker for Girls at High-Risk of Sex Trafficking. Manassas City Police Department.

**Mehlman-Orozco, Kimberly B.** (2016). Invited Guest Speaker on Human Trafficking. Woodbridge Woman's Club.

**Mehlman-Orozco, Kimberly B.** (2016). Invited Guest Speaker for TEAM Summer Quest: High-Risk Youth Diversion Program. Manassas City Police Department.

**Mehlman-Orozco, Kimberly B.** (2016). Invited Guest Speaker on Human Trafficking. Soroptimist International, Alexandria Chapter.

**Mehlman-Orozco, Kimberly B.** (2016). Invited Guest Speaker on Human Trafficking. Republican Women of Clifton.

**Mehlman-Orozco, Kimberly B.** (2016). Invited Guest Speaker on Human Trafficking in Northern Virginia. Westminster at Lake Ridge.

**Mehlman-Orozco, Kimberly B.** (2016). Keynote Speaker. Soroptimist Human Trafficking Awareness Event.

**Mehlman-Orozco, Kimberly B.** (2015). Invited Guest Speaker on Human Trafficking. Trinity Episcopal Church.

**Mehlman-Orozco, Kimberly B.** (2015). Invited Guest Speaker for TEAM Summer Quest: High-Risk Youth Diversion Program. Manassas City Police Department.

**Mehlman-Orozco, Kimberly B.** (2014). Invited Guest Speaker for TEAM Summer Quest: High-Risk Youth Diversion Program. Manassas City Police Department.

**Mehlman-Orozco, Kimberly B.** (2014). Invited Guest Speaker on Mapping Suspected Human Trafficking Networks through Advertisements. Homeland Security Investigations, DHS, Buffalo, NY.

**Mehlman-Orozco, Kimberly B.** (2013). Exhibitor. Governor's Summit on Human Trafficking. Richmond, VA.

**Mehlman-Orozco, Kimberly B.** (2013). Invited Guest Speaker on Labor Trafficking. St. Francis of Assisi Catholic Church.

**Mehlman-Orozco, Kimberly B.** (2011). Keynote Speaker. First Annual Quetzal Award Gala. Guatemalan Center of New England.

EXPERT WITNESS CASES—CONSULTATION AND/OR TESTIMONY

| | |
|---|---|
| Forthcoming | Woodhull Freedom Foundation et al. v. United States. |
| 2023 | Government of the United States Virgin Islands v. JP Morgan Chase Bank, N.A. and JP Morgan Chase Bank, N.A. v. James Edward Staley Case No. 22-cv-10904-JSR |
| 2023 | Jane Doe 1 v. JP Morgan Chase & Co. Case No. 1:22-cv-10019-JSR |
| 2023 | People of the State of California v. Angelina Avila Case No. BA508653-02 |
| 2023 | M.H. v. G6 Hospitality LLC, et. al. United States District Court Eastern District of Texas Sherman Division. 4:22-cv-198 |
| 2023 | United States of America v. Kamal Bhula, et al. United States District Court, For the District of New Mexico. Case No. 1:19-cr-01631-DHU |
| 2023 | United States of America v. Mei Xing, United States District Court for the Central District of California. No. 2:20-CR-0228(A)-FMO |
| 2023 | Jane Doe v. Fairfax County Police. 1:21cv1150(AJT/JFA). |
| 2022 | Charity Pearrow v. ESA P Portfolio LLC, et. al. 21-cv-62276-BLOOM/Valle |
| 2022 | K.R. v. 4200 Roosevelt LLC, et. al. Case Number 00552 |
| 2022 | C.A. v. 4200 Roosevelt LLC, et. al. Case Number 03355 |

| | |
|---|---|
| 2022 | B.H. v. 4200 Roosevelt LLC, et. al. Case Number 03356 |
| 2022 | K.C. v. 4200 Roosevelt LLC, et. al. Case Number 01926 |
| 2022 | T.E. v. 4200 Roosevelt LLC, et. al. Case Number 00994 |
| 2022 | V.S. v. 4200 Roosevelt LLC, et. al. Case Number 00997 |
| 2022 | Sherman, Gozun, and Nash v. Trinity Teen Solutions, Inc. Case Number 20-CV-215-SWS |
| 2022 | N.Z. v. Knights of Trevose, et. al. Civil Action Number 02642 |
| 2022 | G.D. v. Knights of Trevose, et. al. Civil Action Number 02631 |
| 2022 | Jane Doe 1-4 v. Red Roof Inns, Inc., et. al. Civil Action Number 1:21-cv-04278-WMR |
| 2022 | W.K., et. al. v. Red Roof Inns, Inc., et. al. Civil Action Number 1:20-cv-5263-VHC |
| 2022 | J.A. v. Red Roof Inns, Inc., et. al. Civil Action Number 1:21-cv-03655-TWT |
| 2022 | Casilao et. al. v. Hotelmacher LLC, et. al. Case No.: CIV-17-800-SLP |
| 2022 | S.Y. v. Inn of Naples Hotel LLC and Inn of Naples, LLC. Case No.: 2:20-cv-00609-JES |
| 2022 | S.Y. v. Naples Hotel Company and the Gulfcoast Inn of Naples Owners Association, Inc. 2:20-cv-00608 |
| 2022 | C.S. v. Inn of Naples Hotel, LLC and Inn of Naples, LLC 2:20-cv-00629 |
| 2022 | C.S. v. Naples Hotel Company and the Gulfcoast Inn of Naples Owners Association, Inc. 2:20-cv-00631 |
| 2022 | People of the State of California v. Diane Mirabal. Superior Court of the State of California for the County of Santa Clara. Case No.: 98312 |
| 2021-Present | MADELYN CASILAO, HARRY LINCUNA, and ALLAN GARCIA, on behalf of themselves and all others similarly situated, Plaintiffs, v. HOTELMACHER LLC, |

dba HOLIDAY INN EXPRESS; STEAKMACHER, LLC, dba MONTANA MIKE'S STEAKHOUSE; SCHUMACHER INVESTMENTS, LLC, dba WATER ZOO; APEX USA, INC.; WALTER SCHUMACHER; and CAROLYN SCHUMACHER, Defendants. UNITED STATES DISTRICT COURT WESTERN DISTRICT OF OKLAHOMA Case No.: CIV-17-800-SLP

| | |
|---|---|
| 2021-2022 | Jane Doe v. TRX Insurance Services, Inc and Richard Metz. United States District Court for the Eastern District of Pennsylvania. Civil Action No. 2:20-cv-04095-MMB |
| 2021-2022 | The People of the State of California v. Rachele Eschenburg. Case Number: FCR350232 |
| 2021 | Heidi Gilbert, Amber Means, Mandy Meloon, Gabriela Joslin, and Kay Poe,  v. U.S.A Taekwondo, Inc., District of Colorado |
| 2019-2021 | United States v. Matthew Woods, United States District of New Mexico |
| 2019 | United States v. Adonis Baker, United States District of New Mexico |
| 2019 | United States v. Cornelius Galloway, United States District of New Mexico |
| 2018 | RCMP Federal Serious and Organized Crime R vs. Downey & Beals C/O Human Trafficking 2016-465660, Halifax, Canada |
| 2018 | United States of America vs. Savanah April Via, U.S. District Court for the District of Arizona |
| 2018 | Commonwealth of Virginia v. Corey Cardoza, Henrico County |
| 2018 | People v. Kareem Abdur-Razzaaq, Ind. No. 3154/2013, and People v. Lemuel Skipper, Ind. No. 2409/2015, Bronx County |
| 2017-2020 | United States of America v. Miguel Scott Arnold, Terrence Hawkins, Tevin Bynoe, Emonie Murphy, and Joshua Guity-Nunez, United States District Court for the Middle District of Pennsylvania. |
| 2017- 2018 | Doe v. Subh Properties, et al., Civil Litigation, State of Maryland |
| 2017-2018 | State of Ohio v. Michael Moore, Lucas County Court |

| | |
|---|---|
| 2017-2018 | People of the State of California Plaintiff v. Tracy Sims Superior Court of California, County of Los Angeles |
| 2017 | Keo Ratha; Sem Kosal; Sophea Bun; Yem Ban; Nakry Phan; and Sok Sang v. Phatthana Seafood Co., Ltd; S.S. Frozen Food Co., Ltd.; Doe Corporations 1-5; Rubicon Resources, LLC; and Wales & Co. Universe, Ltd. United States District Court for the Central District of California |
| 2017 | In re: REFLEX MEDIA, INC., a Nevada corporation, Claimant, vs. VIBE MEDIA, INC. d/b/a CityVibe.com, a California corporation; SOPHIA THOMPSON, an individual; PEAKRIDGE d/b/a SugarModels.com, an Anguilla company; DANIEL ROMAN a/k/a Daniel Romanesse, an individual; ALI ASKARI, an individual; and DOES 1 through 10, inclusive |
| 2016-2017 | J.S., S.L., and L.C. v. Village Voice Media Holdings LLC, Supreme Court of the State of Washington |
| 2016-2017 | People of the State of California Plaintiff v. James Joseph, et. Al.   Contra Costa County Court |
| 2016 | People of the State of California Plaintiff v. Young Kyung Cho Superior Court of California, County of Los Angeles |
| 2016 | People of the State of California Plaintiff v. Mixon-Givens      Santa Clara County Court |

SELECTION OF MEDIA

| | |
|---|---|
| April 6, 2023 | Forbes. Sex Traffickers Used America's Favorite Family Safety App To Control Victims. |
| January 10, 2023 | U.S. News & World Report. Jury Hears Case Alleging 4 Cops Enabled Prostitution Ring. |
| September 1, 2022 | Court TV. Only Fans Model Murder Case. |
| July 31, 2022 | CGTN. Kimberly Mehlman-Orozco on the role of internet in human trafficking. |
| July 22, 2022 | Court TV. Crystal Kizer: Sex Trafficking Murder Case. |
| December 16, 2021 | NPR. The Facts Of, The Myths About, And The Solutions For Child Trafficking. |
| April 24, 2021 | CBS News. Manhattan District Attorney's office to stop prosecuting prostitution cases. |

| | |
|---|---|
| April 10, 2021 | Fox News. Human smugglers using social media to transport migrants to US: Reports. |
| April 4, 2021 | Forbes. Inside the $4.5 Billion Erotic Massage Parlor Economy. |
| July 4, 2020 | CBS News. Epstein's alleged accomplice Ghislaine Maxwell set to be arraigned next week. |
| January 23, 2020 | Skift. Opening Closed Doors: Can Hotels Do More to Fight Human Trafficking? |
| August 9, 2019 | ABC. This Week with George Stephanopoulos. Panel discussion on Jeffrey Epstein. |
| July 9, 2019 | CBS News. Sex trafficking expert discusses Jeffrey Epstein case and sexual abuse. |
| May 10, 2019 | Hollywood Reporter. Sex Trafficking mars the Mystique of Cannes Film Festival. |
| April 12, 2019 | The Hill. Expert says it's 'very unlikely' Robert Kraft prostitution case would yield human trafficking convictions. |
| March 21, 2019 | CBS. Robert Kraft solicitation charge puts spotlight on sex trafficking. |
| March 4, 2019 | The Washington Post. Surveillance cameras, suitcases and billionaires: How an investigation into massage parlors unfolded in Florida. |
| March 1, 2019 | USA Today. From harmful fetishes to sex trafficking, Robert Kraft case highlights risks facing Asian women. |
| February 24, 2019 | CNN. Robert Kraft allegations: A sex trafficking expert weighs in. |
| January 11, 2019 | The Seattle Times. Documentary puts new attention on R. Kelly sex allegations. |
| August 22, 2018 | The Crime Report. Backpage Founders: We're Victims of Attack on Free Speech. |
| May 5, 2018 | Delaware Online. Human Trafficking Court shut down, to be merged with other treatment courts in Delaware. |
| May 1, 2018 | Delaware Online. Despite good intentions, Delaware slow to address human trafficking. |
| April 24, 2018 | ABC. Will new law protect women from sex trafficking? |

| | |
|---|---|
| April 23, 2018 | The Ringer. How Sex Ads Became a Battleground for the Future of the Internet. |
| April 22, 2018 | Miami Herald. He pimped a minor at Santa's Enchanted Forest. He got slapped with federal prison. |
| April 13, 2018 | Yahoo Lifestyle. Women's March lambasted for criticizing shutdown of Backpage.com. |
| April 10, 2018 | Miami Herald. Florida's sex industry 'in a panic' after feds shut down notorious Backpage website. |
| April 9, 2018 | The Crime Report. With Backpage Closed, Where Will The Sex Slave Trade Go? |
| March 22, 2018 | Washington Post. Bill enabling prosecutors, victims to pursue websites that host sex traffickers heads to White House. |
| March 2, 2018 | Governing. 3 Cities Lead Fight Against Human Trafficking. |
| February 1, 2018 | Vanity Fair. The Republican Party is Having Another Todd Akin Fiasco. |
| February 1, 2018 | New York Magazine. Missouri GOP Senate Hopeful Goes Off the Deep End on the Sexual Revolution and Human Trafficking. |
| January 31, 2018 | Kansas City Star. Josh Hawley blames sex trafficking on 'sexual revolution' of 1960s in leaked audio. |
| January 25, 2018 | Homeland Security Today. Expert Delves Into Real Face of Human Trafficking: Victims and Perpetrators. |
| January 23, 2018 | Huffington Post. Study Finds More Than 9,000 Brothels Masquerading As Legit Businesses. |
| January 11, 2018 | International Business Times. Human trafficking: Why we are all guilty of supporting the modern slave trade. |
| January 8, 2018 | Majority Report Radio. America's Slaves of the New Millennium with Dr. Kimberly Mehlman-Orozco. |
| December 21, 2017 | Fast Company. Hotels Are Key In The Fight To End Human Trafficking. |
| December 12, 2017 | WNPR. The Colin McEnroe Show. Child Labor In America And Abroad. |
| November 4, 2017 | C-SPAN. Hidden in Plain Sight Book Talk. |

| | |
|---|---|
| September 22, 2017 | Gray Media. Interview by Kyle Midura. Sex Trafficking Internet Crackdown Proposal. |
| August 8, 2017 | i24 news. Interview for Stateside with David Shuster. Model allegedly kidnapped for dark web auction. |
| August 2, 2017 | Newsy. Interview for "The Why" on human trafficking on the Internet. |
| July 30, 2017 | Al Jazeera. Segment Produced by Ruairi Casey. World Day Against Human Trafficking. |
| July 25, 2017 | Fox News Radio. Interviewed by Eben Brown. "Security America" segment on human smuggling deaths in San Antonio. |
| July 25, 2017 | Dallas News. Interviewed by Sarah Mervosh. New trick of the sex trade: Pimps can use retail gift cards to buy Backpage.com ads. |
| July 24, 2017 | WJLA. Interviewed by Stephen Loiaconi. Human smuggling deaths underscore need for immigration reform, experts say. |
| July 18, 2017 | The Washington Post. Interviewed by Tom Jackman. Under attack, Backpage.com has its supporters as anti-trafficking tool. But many differ. |
| June 11, 2017 | PJ Media. Interviewed by Karl Herchenroeder. Expert Notes Gap in Human-Trafficking Laws as Senators Press for Fund Renewal. |
| April 19, 2017 | WYPR. Interviewed by Tom Hall. Misinformation Sparked #DCMissingGirls Outrage, But It Highlights Real And Overlooked Issues. |
| March 30, 2017 | CBS. Interviewed by Jennifer Earl. Mom's warning about "human trafficking" at IKEA goes viral; what you need to know. |
| March 29, 2017 | Women's Health. Interviewed by Korin Miller. This Mom Claims She Encountered Human Traffickers At IKEA And People Are Freaking Out. |
| February 10, 2017 | Miami Herald. Interviewed by David Ovalle. Florida lawsuit targets website decried as hub for human trafficking. |
| February 3, 2017 | Miami Herald. Interviewed by David Ovalle. The 'adult' section might be closed but Miami sex workers still on the job. |

| | |
|---|---|
| January 1, 2017 | OutSmart Magazine. Interviewed by Dr. Laura McGuire on Human Trafficking. Hidden in Plain Sight: Researcher Dr. Mehlman-Orozco Discusses the Realities of Human Trafficking. |
| February 3, 2015 | NBC. Interviewed by Tracy Connor. Shoe Bomber has 'Tactical Regrets' Over Failed American Airlines Plot. |
| January 19, 2015 | CNN. Interviewed by Pam Brown. 'Jihad Jane' moved by 'love' and feminine 'pride.' |
| August 15, 2013 | USA Today, Interviewed by Yamiche Alcindor. Dozens of States Pass Laws to Fight Human Trafficking. |
| June 6, 2013 | USA Today. Interviewed by Yamiche Alcindor. Blue Campaign by DHS aims to combat human trafficking. |
| August 12, 2012 | Fox 5 News (DC/MD/VA). Television interview on in-state tuition report on Maryland. Interview by reporter Shawn Yancy. |
| May 18, 2011 | Chronicle of Higher Education. Interviewed for an in-state tuition story by Katherine Mangan, "In-State Tuition for Illegal Immigrants Can Be a Plus for Both States and Students." |
| March 24, 2011 | NBC 10 (RI). Television interview on Latino population growth, "Digging Deeper: Hispanics on the Rise." |
| February 18, 2011 | The Yale Herald. Interviewed for a story on racial profiling against immigrants by police. Story by Lucas Iberico-Lozada, "East Haven Police Accused of Brutality, Racism." |
| June 2, 2010 | Style Weekly. Interviewed for a human trafficking story by Peter Galuszka, "The New Slavery: Virginia becomes haven for human trafficking." |

OTHER PROFESSIONAL TRAINING

**Intelligence Community Conference**                     Traffik Analysis Hub
Summer 2021                        Conference

**Transportation Industry Against Human Trafficking**     U.S. Department of Commerce
Fall 2020                          Presentation

**"Freedom Together" D.C., M.D., and V.A. Regional**      D.C., M.D., and V.A. Task Forces
**Anti Human Trafficking Task Force Conference**
Spring 2018                        Conference

| | |
|---|---|
| **Virginia Forum on Human Trafficking**<br>Fall 2015 · Conference | Dept. of Criminal Justice Services |
| **Regional Conference of Human Trafficking<br>Task Forces**<br>Fall 2015 · Conference | DMV Anti-Trafficking Working<br>Group |
| **Maryland Freedom Conference**<br>Winter 2015 · Conference | Towson University |
| **Sharing Lessons, Sharing Responsibility:<br>Combating Human Trafficking**<br>Spring 2013 · Conference | Migration Policy Institute |
| **Freedom Network Annual Conference**<br>Spring 2013 · Conference | Freedom Network |
| **Human Trafficking Panel Discussion**<br>Spring 2013 · Working Group | George Washington Law |
| **Analytic Statistics and Meta Analysis**<br>Spring 2011 · Paid Training | Stata |
| **Systematic Review and Meta Analysis**<br>Spring 2009, Fall 2010 · Independent Graduate Study | GMU |
| **PubMed, NLMGateway, ToxNet and ClinicalTrials.gov**<br>Summer 2009 · Search Certifications | National Library of Medicine |
| **Ovid, ProQuest, and Web searches**<br>Summer 2009 · Search Certifications | AHRQ |
| **Introduction to ArcGIS Workshops**<br>Fall 2009-Summer 2010 | George Mason University |
| **Hand Searching Systematic Review Workshop**<br>Fall 2009 · Search Certifications | Cochrane Collaboration |

## AWARDS

| | |
|---|---|
| *Independent Publisher Award, 2019* | Silver Medal for Current Events (<u>Jihadi Next Door</u>). |
| *Independent Publisher Award, 2018* | Bronze Medal for Social Issues/Humanitarian (<u>Hidden in Plain Sight: America's Slaves of the New Millennium</u>). |
| *Dissertation Completion Award, 2012* | George Mason University, College of Humanities and Social Sciences. |
| *Deans Challenge Award, 2009* | George Mason University, College of Humanities and Social Sciences. |

## SERVICE

| | |
|---|---|
| Peer Reviewer | Office of Justice Programs (OJP), 2020-Present |
| Panel of Expert Witnesses | Los Angeles Superior Court, WI2017-Present |
| Reviewer | Journal of Human Trafficking, FA2014-Present |
| Invited Peer Reviewer | Office of Justice Programs, SP2020-Present |
| Advisory Board Member | Empower Her Network, FA2017- Present |
| Volunteer | Prince William County Police Santa Cops, WI2021 & WI 2022 |
| Advisory Board Member | Dressember (Anti-trafficking foundation), SP2017-SU2021 |
| Reviewer | Taylor & Francis Books, SP2021 |
| Reviewer | Justice Quarterly, WI2018- FA2019 |
| Survey Methodologist Advisor | United Against Slavery, FA2017-FA2019 |
| Member | Prince William County Human Trafficking Task Force, SU2013-SU2018 |
| Member | Prince George's County Human Trafficking Task Force, SU2012-SU2014 |
| Member and Former President | Soroptimist International of Woodbridge, FA2015-SP2018 |
| Reviewer | American Journal of Evaluation, FA2014-FA2015 |
| Member | Prince George's County Human Trafficking Task Force, SU2013-2015 |
| Reviewer | Columbia University Press, FA2013 |
| President and Founding Officer | Student Center for Immigration Research, George Mason University, FA2008 – FA2010 |
| Member | Criminology, Law & Society Student Association, George Mason University, FA2009 – WI2012 |
| Volunteer | Prince William County Jail, Classification Department, 500 hours, SP 2005 |

PROFESSIONAL MEMBERSHIP

    National Society for Collegiate Scholars
    Phi-Alpha Delta Pre-Law Fraternity
    Alpha Chi Honors Fraternity
    American Society of Criminology
    National Criminal Justice Honors Fraternity
    Alpha Phi Sigma Honors Society

# APPENDIX B. Expert Witness Testimony

*I have testified and/or issued a report in the following cases, but have been retained in many others:*

**Criminal Prosecution**

United States of America v. Kamal Bhula, et al. United States District Court, For the District of New Mexico. Case No. 1:19-cr-01631-DHU

People of the State of California Plaintiff v. Mixon-Givens Santa Clara County Court

People of the State of California Plaintiff v. Joseph, et. Al. Contra Costa County Court (Case No: 5-160639-1)[154]

People v. Kareem Abdur-Razzaaq, Ind. No. 3154/2013, Bronx County[155]

People v. Lemuel Skipper, Ind. No. 2409/2015, Bronx County[156]

Commonwealth of Virginia v. Corey Cardoza, Henrico County[157]

United States v. Cornelius Galloway, United States District of New Mexico[158]

State of Ohio v. Michael Moore, Lucas County Court (Case No. CR 16-3191)

**Criminal Defense**

United States of America v. Mei Xing, United States District Court for the Central District of California. No. 2:20-CR-0228(A)-FMO

People of the State of California v. Angelina Avila, Superior Court of the State of California, in and for the County of Los Angeles (Case No. BA508653-02)

United States of America v. Emonie Murphy, U.S. District Court for the Middle District of Pennsylvania

---

[154] Testified at grand jury on 4/13/2016 and at trial on 7/12/2017. Prosecutor's name is Aron DeFerrari: ADeFerrari@contracostada.org.
[155] Testified at Frye motion for another expert witness on behalf of the prosecution.
[156] Testified at Frye motion for another expert witness on behalf of the prosecution.
[157] Testified at Daubert hearing and prevailed as an admitted expert. Case settled before trial.
[158] Testified at Daubert hearing and prevailed as admitted expert.

People of the State of California Plaintiff v. Young Kyung Cho Superior Court of California, County of Los Angeles (Case No: 6CJ10198-01)[159]

United States of America v. Landrum et. Al. Via. U.S. District Court for the District of Arizona (Case No. 4:16-cr-01560-RM-JR)

The People of the State of California v. Rachele Eschenburg. Case Number: FCR350232

People of the State of California v. Diane Mirabal. Superior Court of the State of California for the County of Santa Clara. Case No.: 98312[160]

**Civil Defense**

Government of the United States Virgin Islands v. JP Morgan Chase Bank, N.A. and JP Morgan Chase Bank, N.A. v. James Edward Staley Case No. 22-cv-10904-JSR

Jane Doe 1 v. JP Morgan Chase & Co. 1:22-cv-10019-JSR

M.H. v. G6 Hospitality LLC, et. al. 4:22-cv-198

Charity Pearrow v. ESA P Portfolio LLC, et. al. 21-cv-62276-BLOOM/Valle

K.R. v. 4200 Roosevelt LLC, et. al. Case Number 00552

C.A. v. 4200 Roosevelt LLC, et. al. Case Number 03355

B.H. v. 4200 Roosevelt LLC, et. al. Case Number 03356

K.C. v. 4200 Roosevelt LLC, et. al. Case Number 01926

T.E. v. 4200 Roosevelt LLC, et. al. Case Number 00994

V.S. v. 4200 Roosevelt LLC, et. al. Case Number 00997

Sherman, Gozun, and Nash v. Trinity Teen Solutions, Inc. Case Number 20-CV-215-SWS

N.Z. v. Knights of Trevose, et. al. Civil Action Number 02642

G.D. v. Knights of Trevose, et. al. Civil Action Number 02631

Jane Doe 1-4 v. Red Roof Inns, Inc., et. al. Civil Action Number 1:21-cv-04278-WMR

W.K., et. al. v. Red Roof Inns, Inc., et. al. Civil Action Number 1:20-cv-5263-VHC

---

[159] Testified in trial on 11/7/2016 and 12/2/2017.
[160] Declaration only, not report.

J.A. v. Red Roof Inns, Inc., et. al. Civil Action Number 1:21-cv-03655-TWT

Casilao et. al. v. Hotelmacher LLC, et. al. Case No.: CIV-17-800-SLP

S.Y. v. Inn of Naples Hotel LLC and Inn of Naples, LLC. Case No.: 2:20-cv-00609-JES

S.Y. v. Naples Hotel Company and the Gulfcoast Inn of Naples Owners Association, Inc. 2:20-cv-00608

C.S. v. Inn of Naples Hotel, LLC and Inn of Naples, LLC 2:20-cv-00629

C.S. v. Naples Hotel Company and the Gulfcoast Inn of Naples Owners Association, Inc. 2:20-cv-00631

M.B. v. Roosevelt Inn LLC (MARCH TERM, 2017 NO.: 00712)

Keo Ratha; Sem Kosal; Sophea Bun; Yem Ban; Nakry Phan; and Sok Sang v. Phatthana Seafood Co., Ltd; S.S. Frozen Food Co., Ltd.; Doe Corporations 1-5; Rubicon Resources, LLC; and Wales & Co. Universe, Ltd. United States District Court for the Central District of California.[161]

Jane Doe v. TRX Insurance Services, Inc and Richard Metz. United States District Court for the Eastern District of Pennsylvania. Civil Action No. 2:20-cv-04095-MMB

Heidi Gilbert, Amber Means, Mandy Meloon, Gabriela Joslin, and Kay Poe, v. U.S.A Taekwondo, Inc. and Steven Lopez. United States District Court for the District of Colorado. Civil Action No. 1: 18-cv-00981-CMA-MEH

**Civil Plaintiff**

Woodhull Freedom Foundation et al. v. United States[162]

Jane Doe v. Fairfax County Police 1:21cv1150(AJT/JFA)[163]

---

[161] Also deposed in this case. Dismissed on summary judgement.

[162] Not an expert witness report, but rather a declaration: https://www.eff.org/document/declaration-dr-kimberly-mehlman-orozco-support-woodhull-et-al-motion-preliminary-injunction

[163] Pro Bono case, which has received national media attention. See, for example: https://www.newsweek.com/virginia-cops-protected-sex-trafficking-ring-return-free-sex-victims-lawsuit-1661937

# APPENDIX C. Materials Reviewed and Considered

In addition to the materials specifically cited or mentioned in my report, I considered the following documents in forming my opinions:

AG Case
AG - Doc 40 - Northbrook Answer 6.7.2022.pdf
AG - Karim Vellani Final Report 06.14.23.pdf
AG Depo and Exhibits
AG- Doc 1- Complaint- 12.28.2020.pdf
Darrell Chaneyfield Expert Report (v9) & CV.pdf
Discovery
AG - Def Resp to Pltf RFA 8.17.22.pdf
AG - Def Resp to Pltf Rogs 8.17.22.pdf
AG - Def Resp to Pltf RPDs 8.17.22.pdf
AG - Defs Responses to Pltfs 2nd Supp RPD 4.18.2023.pdf
NORTHBROOK SUPP 0001 - NORTHBROOK SUPP 0086 [NBI 000624 - NBI 000709].pdf
Naeshia McDowell Draft Expert Report (v9) (1).pdf
GW Case
Expert Reports
Darrell Chaneyfield Expert Report (v9) _ CV(101957928.1).pdf
GW - Karim Vellani Final Report 06.14.23.pdf
Naeshia McDowell Draft Expert Report (v9).pdf
GW - Doc 1 - Complaint 12.28.20.pdf
GW - Doc 41 - Northbrook Answer 6.7.22022.pdf
GW Depo and Exhibits
GW_1.pdf
GW_2.pdf
GW_3.pdf
GW_4.pdf
GW_5.pdf
GW_6.pdf
GW_7.pdf
GW_8.pdf
GW_9.pdf
GW_10.pdf
GW_11.pdf
GW_12.pdf
GW_13.pdf
GW_14.pdf
GW_15.pdf

GW_16.pdf
GW_17.pdf
GW_18.pdf
GW_19.pdf
GW_20.pdf
GW_21.pdf
GW_22.pdf
GW_23.pdf
GW_24.pdf
GW_25.pdf
GW_26.pdf
GW_27.pdf
GW_28.pdf
GW_29.pdf
GW_30.pdf
GW_31.pdf
GW_32.pdf
GW_33.pdf
GW_34.pdf
GW_35.pdf
GW_PDFTran.pdf
Video 1.mov
Video 2.mov
Video 3.mov
Video 4.mov
Video 5.mov
Video 6.mov
Video 7.mov
Video 8.mov
Video 9.mov
Video 10.mov
Video 11.mov
Video 12.mov

# APPENDIX D. International Labour Office's Operational Indicators of Commercial Sexual Exploitation of Children

## Indicators of trafficking of children for sexual exploitation

*Exploitation is inherent to the situation of children under 18 used or offered for prostitution or pornography and there is no need for indicators to prove it. The indicators of additional exploitation below are given to characterize other elements of exploitation children may suffer. In addition, the Palermo Protocol specifically states that, in the case of children, there is no need to prove "the threat or use of force or other forms of coercion, of abduction, of fraud, of deception, of the abuse of power or of a position of vulnerability" in order to establish the crime of trafficking. Nevertheless, it was decided to retain indicators of deception, coercion and abuse of vulnerability in order to analyse trafficking in children with harmonised tools within Europe.*

### INDICATORS OF DECEPTIVE RECRUITMENT

Strong Indicator

Deceived about the nature of the job or location

Medium Indicators

Deceived about access to education opportunities

Deceived about conditions of prostitution

Deceived about content or legality of work contract

Deceived about family reunification

Deceived about housing and living conditions

Deceived about legal documentation or obtaining legal migration status

Deceived about travel and recruitment conditions

Deceived about wages/earnings

Deceived through promises of marriage or adoption

### INDICATORS OF COERCIVE RECRUITMENT

Strong Indicators

Abduction, forced marriage, forced adoption or selling of victim

Debt bondage

Isolation, confinement or surveillance

Threats of violence against victim

Violence on victims

Medium Indicators

Confiscation of documents

Threat of denunciation to authorities

Threats to inform family, community or public

Violence on family (threats or effective)

Withholding of money

### INDICATORS OF RECRUITMENT BY ABUSE OF VULNERABILITY

Medium Indicators

Abuse of cultural/religious beliefs

Abuse of difficult family situation

Abuse of illegal status

Abuse of lack of education (language)

Abuse of lack of information

Control of exploiters

Difficulties in the past

Difficulty to organise the travel

Economic reasons

False information about law, attitude of authorities

False information about successful migration

Family situation

General context

Personal situation

Psychological and emotional dependency

Relationship with authorities/legal status

### INDICATORS OF ADDITIONAL EXPLOITATION

Strong Indicator

Hazardous work

Medium Indicators

Bad living conditions

Excessive working days or hours

Low or no salary

No social protection (contract, social insurance, etc.)

Very bad working conditions

Wage manipulation

### INDICATORS OF COERCION AT DESTINATION

Strong Indicators

Confiscation of documents

Debt bondage

Forced into illicit/criminal activities

Forced tasks or clients

Isolation, confinement or surveillance

Threats of violence against victim

Under strong influence

Violence on victims

Medium Indicators

Forced to act against peers

Forced to lie to authorities, family, etc.

Threat of denunciation to authorities

Threat to impose even worse working conditions

Threats to inform family, community or public

Violence on family (threats or effective)

Withholding of wages

### INDICATORS OF ABUSE OF VULNERABILITY AT DESTINATION

Strong Indicator

Dependency on exploiters

Medium Indicators

Difficulties in the past

Difficulty to live in an unknown area

Economic reasons

Family situation

Personal characteristics

Relationship with authorities/legal status